POTOMAC ELECTRIC POWER CO. *v.* DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS, U. S. DEPARTMENT
OF LABOR, ET AL.

No. 79–816.   Argued October 8, 1980—Decided December 15, 1980

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed a dissenting opinion, *post*, p. 284.

*Richard W. Turner* argued the cause for petitioner. With him on the briefs was *Stephen A. Trimble.*

*Elinor Hadley Stillman* argued the cause for the federal respondent. With her on the brief were *Solicitor General McCree, Deputy Solicitor General Geller, Laurie M. Streeter,* and *Lois G. Williams. Leslie Scherr* argued the cause for respondent Cross. With him on the brief was *William F. Krebs.*

JUSTICE STEVENS delivered the opinion of the Court.

Under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 44 Stat. (part 2) 1424, as amended, 33 U. S. C. §§ 901–950 (1976 ed. and Supp. III), compensation for a permanent partial disability must be determined in one of two ways. First, if the injury is of a kind specifically identified in the schedule set forth in §§ 8 (c)(1)–(20) of the Act, 33 U. S. C. §§ 908 (c)(1)–(20), the injured employee is entitled to receive two-thirds of his average weekly wages for a specific number of weeks, regardless of whether his earning capacity has actually been impaired. Second, in all other cases, § 8 (c)(21), 33 U. S. C. § 908 (c)(21), authorizes compensation equal to two-thirds of the difference between the

employee's preinjury average weekly wages and his postinjury wage-earning capacity, during the period of his disability.[1] The question in this case is whether a permanently partially disabled employee, entitled to compensation under the statutory schedule, may elect to receive a larger recovery under § 8 (c)(21) measured by the actual impairment of wage-earning capacity caused by his injury. Although Congress could surely authorize such an election, it has not yet done so.

---

[1] Section 8, as set forth in 33 U. S. C. § 908, provides, in part, as follows:

"Compensation for disability shall be paid to the employee as follows:

. . . . . . . . . . . . . . . .

"(c) Permanent partial disability: In case of disability partial in character but permanent in quality the compensation shall be 66⅔ per centum of the average weekly wages, which shall be in addition to compensation for temporary total disability or temporary partial disability paid in accordance with subdivision (b) or subdivision (e) of this section, respectively, and shall be paid to the employee, as follows:

"(1) Arm lost, three hundred and twelve weeks' compensation.

"(2) Leg lost, two hundred and eighty-eight weeks' compensation.

"(3) Hand lost, two hundred and forty-four weeks' compensation.

"(4) Foot lost, two hundred and five weeks' compensation.

"(5) Eye lost, one hundred and sixty weeks' compensation.

. . . . . . . . . . . . . . . .

"(18) Total loss of use: Compensation for permanent total loss of use of a member shall be the same as for loss of the member.

"(19) Partial loss or partial loss of use: Compensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member.

"(20) Disfigurement: Proper and equitable compensation not to exceed $3,500 shall be awarded for serious disfigurement of the face, head, or neck or of other normally exposed areas likely to handicap the employee in securing or maintaining employment.

"(21) Other cases: In all other cases in this class of disability the compensation shall be 66⅔ per centum of the difference between his average weekly wages and his wage-earning capacity thereafter in the same employment or otherwise, payable during the continuance of such partial disability, but subject to reconsideration of the degree of such impairment by the deputy commissioner on his own motion or upon application of any party in interest."

We therefore hold that respondent Cross' recovery must be limited by the statutory schedule.

Cross is employed by Potomac Electric Power Co. (Pepco) as a cable splicer—a job that requires strength and agility. In 1974, he earned a total of $21,959.38, including overtime pay of $8,543.30. In December of that year, he injured his left knee in the course of his employment, thereby suffering a permanent partial loss of the use of his leg. The physical impairment is described as a 5 to 20% loss of the use of one leg, but the resulting impairment of his earning capacity is apparently in excess of 40%.[2] Although Cross has retained his job, he has not been able to perform all of the strenuous duties required of a cable splicer and therefore he has received no overtime and has not qualified for certain pay increases.

Because he worked in the District of Columbia, respondent Cross is entitled to compensation under the LHWCA.[3] It is undisputed that the injury to his leg is a "permanent partial disability" within the meaning of § 8 (c) of the Act; he therefore has an unquestioned right to a compensation award measured by a fraction of his earnings for 288 weeks.[4]

---

[2] Cross' 1975 earnings amounted to $12,086.48, in contrast to 1974 earnings of $21,959.38.

[3] The District of Columbia Workmen's Compensation Act, D. C. Code §§ 36–501 to 36–504 (1973 and Supp. V–1978), adopts the LHWCA as the workmen's compensation law for the District of Columbia. See *Cardillo* v. *Liberty Mutual Ins. Co.*, 330 U. S. 469, 471 (1947). Section 1 of the Act, D. C. Code § 36–501 (1973), provides:

"The provisions of chapter 18 of title 33, U. S. Code, including all amendments that may hereafter be made thereto, shall apply in respect to the injury or death of an employee of an employer carrying on any employment in the District of Columbia, irrespective of the place where the injury or death occurs; except that in applying such provisions the term 'employer' shall be held to mean every person carrying on any employment in the District of Columbia, and the term 'employee' shall be held to mean every employee of any such person."

[4] Under §§ 8 (c)(2) and (18), an employee suffering a total loss of the use of one leg is entitled to receive two-thirds of his average weekly wages

His claim, however, is for the larger amount measured by two-thirds of the difference between his average weekly earnings before the injury and his present wage-earning capacity, multiplied by the number of weeks that his disability continues.[5]

The Administrative Law Judge allowed the larger recovery. He held that an injured employee is not required to accept the specific amount authorized by §§ 8 (c)(2) and (19) for the partial loss of the use of a leg, but instead may recover an amount based on the formula set forth in § 8 (c)(21) for "all other cases." Using that formula, the Administrative Law Judge found that respondent Cross' permanent loss of earning capacity amounted to approximately $130 per week, and ordered Pepco to pay him two-thirds of that amount each week for the remainder of his working life. The Benefits Review Board affirmed. *Cross* v. *Potomac Electric Power Co.*, 7 BRBS 10 (1977).

The United States Court of Appeals for the District of Columbia Circuit also affirmed. 196 U. S. App. D. C. 417,

_____

for a period of 288 weeks. If an injury results in a partial loss of the use of a scheduled member, as in this case, § 8 (c)(19) provides that compensation is to be calculated as a proportionate loss of the use of that member. Under the schedule, Cross is therefore entitled to receive two-thirds of his average weekly wages for whatever fraction of 288 weeks represents the proportionate loss of the use of his leg caused by the knee injury. Because this case was decided under § 8 (c)(21), rather than the schedule, it was not necessary for the Administrative Law Judge to determine the precise extent of respondent Cross' disability. The medical testimony indicates that he suffered a 5 to 20% loss of the use of his leg.

[5] This computation is derived from § 8 (c)(21), 33 U. S. C. § 908 (c)(21), quoted in n. 1, *supra*. It should be noted that "wage-earning capacity" under § 8 (c)(21) is not necessarily measured by an injured employee's actual postinjury earnings. Section 8 (h) of the Act, as set forth in 33 U. S. C. § 908 (h), provides:

"The wage-earning capacity of an injured employee in cases of partial disability under subdivision (c)(21) of this section or under subdivision (e) of this section shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-earning capacity: *Pro-*

606 F. 2d 1324 (1979). Recognizing that the Act "must be construed in light of its humanitarian objectives," and noting a "recent trend in workmen's compensation law away from the idea of exclusivity of scheduled benefits," the court concluded that the "all other cases" language in § 8 (c)(21) provided a "remedial alternative" measure of compensation for cases in which "the scheduled benefits fail adequately to compensate for a diminution in [wage-earning] capabilities." [6] While expressing sympathy for the result reached by the majority, one judge dissented. [7]

# I

The language of the Act plainly supports the view that the character of the disability determines the method of compensation. Section 8 identifies four different categories of disability and separately prescribes the method of compensation

---

*vided, however,* That if the employee has no actual earnings or his actual earnings do not fairly and reasonably represent his wage-earning capacity, the deputy commissioner may, in the interest of justice, fix such wage-earning capacity as shall be reasonable, having due regard to the nature of his injury, the degree of physical impairment, his usual employment, and any other factors or circumstances in the case which may affect his capacity to earn wages in his disabled condition, including the effect of disability as it may naturally extend into the future."

[6] 196 U. S. App. D. C., at 420–421, 606 F. 2d, at 1327–1328.

[7] Before analyzing the statute and its history in detail, Judge MacKinnon wrote:

"Nothing in section 8 permits an employee whose injury is unquestionably confined to one of those set out in the schedule to circumvent Congress' conclusive presumptions with a showing of lost earning capacity in excess of the specified benefit. The majority holds otherwise, and does so despite the fact that during the fifty-two year old regime of an essentially unaltered statutory scheme no federal court has ever read section 8 in that manner while a number of federal courts have adopted a contrary approach. I am not unsympathetic to the result the majority's holding achieves, but I submit that it is within the province of the legislative branch to weigh and decide whether this result ought to obtain." *Id.,* at 422–423, 606 F. 2d, at 1329–1330.

for each.[8]  In the permanent partial disability category, § 8 (c) provides a compensation schedule which covers 20 different specific injuries.  It then adds an additional subparagraph, § 8 (c)(21), that applies to any injury not included within the list of specific injuries.  There is no language in that additional subparagraph indicating that it was intended to provide an alternative method of compensation for the cases described in the preceding subparagraphs; quite the contrary, by its terms, subparagraph (21) is applicable "In all other cases." [9]

It is also noteworthy that the statutory direction that precedes the schedule of specifically described partial disabilities mandates that the compensation prescribed by the schedule *"shall* be paid to the employee, as follows." [10]  We are not free to read this language as though it granted the employee an election.  Nor are we free to read the subsequent words "all *other* cases" as though they described "all of the foregoing" as well; the use of the word "other" forecloses that reading.

In sum, we find nothing in the statute itself to support the view that the reference to "all other cases" in § 8 (c)(21) was intended to authorize an alternative method for computation of disability benefits in certain cases of permanent partial disability already provided for in the schedule.

---

[8] In addition to permanent partial disability, the Act provides for permanent total, temporary total, and temporary partial disability.  The remedies for permanent and temporary total disability—essentially two-thirds of the employee's average weekly wages during the period of the disability—are set forth in subsections (a) and (b) of § 8, 33 U. S. C. §§ 908 (a) and (b).  The remedy for temporary partial disability—two-thirds of the difference between the employee's preinjury average weekly wages and his postinjury wage-earning capacity during the period of disability, up to a maximum of five years—is set forth in § 8 (e), 33 U. S. C. § 908 (e).

[9] Indeed, it should be noted that the words "other cases" appear twice in subparagraph (21).  See n. 1, *supra.*

[10] 33 U. S. C. § 908 (c) (emphasis supplied).  See n. 1, *supra.*

## II

The legislative history of the Act is entirely consistent with the conclusion that it was intended to mean what it says. Although that history contains no specific consideration of the precise question before us,[11] one aspect of the Act's history is somewhat enlightening. The relevant language was enacted in 1927.[12] It was patterned after a similar "scheduled benefits" provision in the New York Workmen's Compensation Law enacted in 1922.[13] A few years after enactment of the LHWCA, the New York Court of Appeals was confronted with the same question of construction under the New York statute that is now presented to us under the federal statute. The New York Court of Appeals apparently considered the statutory language so clear on its face that little discussion of this issue was necessary:

> "Obviously, the phrase 'in all other cases' signifies that the provisions of the paragraph shall apply only in cases where the injuries received are not confined to a specific

---

[11] Judge MacKinnon's dissenting opinion reviewed the legislative history in detail; although he discovered no clear answer to the exclusivity question, see 196 U. S. App. D. C., at 425, 606 F. 2d, at 1332, he found that, to the extent any conclusions could be drawn, the legislative history supported the view that the schedule and "all other cases" categories were intended to be mutually exclusive. *Id.*, at 425–429, 606 F. 2d, at 1332–1336.

[12] Act of Mar. 4, 1927, 44 Stat. 1424, 33 U. S. C. § 901 *et seq.*

[13] 1922 N. Y. Laws, ch. 615, § 15 (3). The 1922 Act was an extensive revision of the Workmen's Compensation Law of 1914, 1914 N. Y. Laws, ch. 41. A schedule covering particular cases of permanent partial disability initially appeared in the 1914 Act. See 1914 N. Y. Laws, ch. 41, § 15 (3). This schedule was retained, in a slightly revised form, in the 1922 Act. The schedule adopted by Congress in the LHWCA was substantially identical to the New York schedule of 1922. Congress selected the New York statute as the model for the LHWCA because that statute was considered one of the best workmen's compensation laws of its time. See H. R. Rep. No. 1190, 69th Cong., 1st Sess., 2 (1926).

member or specific members." *Sokolowski* v. *Bank of America,* 261 N. Y. 57, 62, 184 N. E. 492, 494 (1933).

Nothing in the original legislative history of the federal Act or in the legislative history of subsequent amendments [14] indicates that Congress did not intend the plain language of the federal statute to receive the same construction as the substantially identical language of its New York ancestor.

## III

The weight of judicial authority also supports a literal reading of the Act.

During the first half century of administration of the LHWCA, federal tribunals consistently construed the schedule benefits provision as exclusive. Although the exclusivity question did not explicitly arise until 1964, prior to that time

---

[14] In 1972, Congress considered and failed to pass an amendment to § 8 (c) that would have permitted an employee suffering from a permanent partial disability caused by a scheduled injury to recover *both* the schedule benefits and two-thirds of his lost wage-earning capacity after expiration of the schedule period. See S. 2318, § 7, 92d Cong., 2d Sess. (1971), reprinted in Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972: Hearings before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess., 7 (1972); H. R. 12006, § 7, 92d Cong., 1st Sess. (1971), and H. R. 15023, § 7, 92d Cong., 2d Sess. (1972), reprinted in Longshoremen's and Harbor Workers' Compensation Act: Hearings before the Select Subcommittee on Labor of the House Committee on Education and Labor, 92d Cong., 2d Sess., 27, 38 (1972). Although Pepco relies heavily upon Congress' rejection of this proposed amendment as support for its position that schedule benefits are exclusive, this action is of marginal relevance in this case because the amendment would have authorized cumulative, not alternative, remedies. Pepco's reliance upon 1949 and 1966 amendments to the Federal Employees Compensation Act (FECA), 5 U. S. C. § 8101 *et seq.,* is similarly misplaced. These amendments, authorizing cumulative remedies under the FECA, shed little light upon Congress' intention with respect to alternative remedies under the LHWCA. See Act of Oct. 14, 1949, ch. 691, § 104, 63 Stat. 855; Act of Sept. 6, 1966, Pub. L. 89–554, 80 Stat. 536.

evidence of loss of wages or wage-earning capacity was considered irrelevant in cases of permanent partial disability falling within the schedule provisions.[15]  In 1964, in *Williams* v. *Donovan*, 234 F. Supp. 135 (ED La.), aff'd, 367 F. 2d 825 (CA5 1966), cert. denied, 386 U. S. 977 (1967), the first federal court to address the exclusivity issue found that "the form and language of the Act" indicated that compensation under § 8 (c)(21) for loss of wage-earning capacity was not available in cases covered by the schedule.  234 F. Supp., at 139.  This construction of the Act went unchallenged for the next decade.[16]

It was not until 1975 that the Benefits Review Board announced its dissatisfaction with the *Williams* construction of the statute and concluded that claimants suffering from a permanent partial disability may elect to proceed under either the schedule or § 8 (c)(21).[17]  The Board has since applied

---

[15] See, *e. g., Travelers Insurance Co.* v. *Cardillo*, 225 F. 2d 137, 143–144 (CA2), cert. denied, 350 U. S. 913 (1955).  It should be noted, however, that this principle was announced in response to employer attempts to defeat an injured employee's claim for schedule benefits on the ground that the employee had suffered no actual loss of wages or wage-earning capacity. Prior to 1964, the federal courts apparently had not been confronted with an employee, entitled to compensation under the schedule, who attempted to secure a greater recovery by establishing an actual loss of wages or wage-earning capacity in excess of the schedule benefit.

[16] Although the question arose in a significantly different context, another 1964 decision, *Flamm* v. *Hughes*, 329 F. 2d 378, 380, suggests that the Court of Appeals for the Second Circuit considered the schedule and "other cases" provisions mutually exclusive.

[17] *Mason* v. *Old Dominion Stevedoring Corp.*, 1 BRBS 357, 363–365 (1975).  In *Mason*, the Board rejected *Williams* in favor of *American Mutual Insurance Co.* v. *Jones*, 138 U. S. App. D. C. 269, 426 F. 2d 1263 (1970), a decision upon which the court below also relied.  See 196 U. S. App. D. C., at 421, 606 F. 2d, at 1328.  The opinion in *Jones*, however, does not address the exclusivity issue presented in this case.  Rather, *Jones* held merely that a scheduled injury can give rise to an award for permanent total disability under § 8 (a) where the facts establish that the injury prevents the employee from engaging in the only employment for which

its construction of the Act in a series of decisions of which the instant case is a member.[18] The divided opinion of the Court of Appeals is apparently the first and only federal court de-

he is qualified. 138 U. S. App. D. C., at 271–272, 426 F. 2d, at 1265–1266. This conclusion is entirely consistent with the statute which, in § 8 (a), directs that "permanent total disability shall be determined in accordance with the facts." 33 U. S. C. § 908 (a). Indeed, since the § 8 (c) schedule applies only in cases of permanent partial disability, once it is determined that an employee is totally disabled the schedule becomes irrelevant. The question presented in *Mason* and in this case is the very different question of whether § 8 (c) permits an employee suffering from a disability determined to be partial in character to choose between recovery under the schedule and recovery under § 8 (c) (21). The Court of Appeals for the Fifth Circuit recently recognized this distinction when it noted that *Williams* and *Jones* are in no way inconsistent, because the former concerns partial disability while the latter concerns total disability. See *Jacksonville Shipyards, Inc.* v. *Dugger*, 587 F. 2d 197, 198 (1979).

[18] See *Collins* v. *Todd Shipyards Corp.*, 9 BRBS 1015 (1979); *Brandt* v. *Avondale Shipyards, Inc.*, 8 BRBS 698 (1978); *Dugger* v. *Jacksonville Shipyards*, 8 BRBS 552 (1978); *Richardson* v. *Perna & Cantrell, Inc.*, 6 BRBS 588 (1977); *Longo* v. *Universal Terminal & Stevedoring Corp.*, 2 BRBS 357 (1975). It should be noted that two of these decisions, *Dugger* and *Longo*, involved permanent total, not permanent partial, disability; therefore, comments in those decisions pertaining to the exclusivity issue are dicta. See n. 17, *supra*. It should also be noted that the Benefits Review Board is not a policymaking agency; its interpretation of the LHWCA thus is not entitled to any special deference from the courts. See *Hastings* v. *Earth Satellite Corp.*, 202 U. S. App. D. C. 85, 94, 628 F. 2d 85, 94 (1980) cert. denied, *post*, p. 905; *Tri-State Terminals, Inc.* v. *Jesse*, 596 F. 2d 752, 757, n. 5 (CA7 1979).

In the Board's most recent examination of the exclusivity issue, *Collins* v. *Todd Shipyards, supra*, Chairman Smith vigorously dissented from the majority's conclusion that § 8 (c) (21) benefits are available for scheduled injuries. 9 BRBS, at 1027–1036. Chairman Smith acknowledged that the contrary construction could produce inequitable results, but concluded that the statutory language would support no other construction:

"The statute is not ambiguous or indefinite. It needs no strained interpretation or construction. The statutory language contained in Section 8 (c) clearly indicates that the schedule awards and the Section 8 (c) (21)

cision accepting that construction. The notion that the plain language of the LHWCA might not mean what it says is thus a relatively recent development surfacing for the first time almost 50 years after its enactment. The relevant judicial authority prior to 1975, although not abundant, indicates that the schedule benefits were considered exclusive.

While the federal decisional authority on this question is scarce, state-law authority apparently is not. The lower court cited, and the respondents rely upon, the "recent trend in workmen's compensation law away from the idea of exclusivity of scheduled benefits." 196 U. S. App. D. C., at 421, 606 F. 2d, at 1328.[19] Although this "trend" unquestionably exists, it is neither uniform nor based entirely on cases presenting issues comparable to the precise issue before us.[20]

awards are mutually exclusive. Sections 8 (c) (1) through (20) set forth the provisions and conditions for making schedule awards. Section 8 (c) (21) represents a clear line of demarcation from the schedule in that it applies to 'all other cases' in the permanent partial class of disability." *Id.*, at 1027.

[19] The majority quoted the following passage from a leading treatise on workmen's compensation law:

" 'Although it is difficult to speak in terms of a majority rule on this point, because of significant differences in statutory background, it can be said that at one time the doctrine of exclusiveness of schedule allowances did dominate the field. But in recent years there has developed such a strong trend in the opposite direction that one might now, with equal justification, say that the field is dominated by the view that schedule allowances should not be deemed exclusive, whether the issue is treatment of a smaller member as a percentage loss of a larger, or treatment of any scheduled loss as a partial or total disability of the body as a whole.' " 196 U. S. App. D. C., at 214–215, 606 F. 2d, at 1328–1329, quoting 2 A. Larson, Workmen's Compensation Law § 58.20, pp. 10–212 to 10–214 (1976) (footnotes omitted).

[20] The trend away from exclusivity identified by Professor Larson has developed, at least in part, in cases involving scheduled injuries which result in either total disability or permanent partial disability extending in effect to other parts of the body. See *id.*, § 58.20, pp. 10–196 to 10–206, 10–214 to 10–220. We are concerned here solely with a case in which

More importantly, a proper understanding of the judicial role in this case reveals that the recent trend actually supports a literal reading of the federal statute. Our task is to ascertain the congressional intent underlying the schedule benefit provisions enacted in 1927; we are not free to incorporate into those provisions subsequent state-law developments that we may consider sound as a matter of policy. In attempting to ascertain the legislative intent underlying a statute enacted over 50 years ago, the view that once "dominate[d] the field" is more enlightening than a recent state-law trend that has not motivated subsequent Congresses to amend the federal statute.[21] The once dominant view is entirely consistent with a literal reading of the Act.

## IV

Respondents suggest two reasons why this settled construction is erroneous. They submit that it does not fulfill the fundamental remedial purpose of the Act and that it may produce anomalous results that Congress probably did not intend. The first submission is not entirely accurate; the second, though theoretically correct, has insufficient force to overcome the plain language of the statute itself.

---

a scheduled injury, limited in effect to the injured part of the body, results in a permanent partial disability.

With respect to the limited question before us, it appears that, despite the recent trend to the contrary, a significant number of jurisdictions continue to view schedule benefits as exclusive in cases of permanent partial disability. See, e. g., E. Blair, Reference Guide to Workmen's Compensation Law § 11:07, p. 11–24 (1974); 11 W. Schneider, Workmen's Compensation § 2322 (a), pp. 562–565 (Perm. ed. 1957). Indeed, Professor Larson's treatise indicates that exclusivity, although perhaps no longer the majority view, nonetheless represents the view of "many jurisdictions." See 2 A. Larson, supra, § 58.00, p. 10–164; § 58.20, pp. 10–206 to 10–212; see also id., § 58.13, p. 10–174.

[21] As Professor Larson noted in the passage quoted by the court below, "at one time the doctrine of exclusiveness of schedule allowances did dominate the field." Id., § 58.20, p. 10–212, quoted in 196 U. S. App. D. C., at 421, 606 F. 2d, at 1328. See n. 19, supra.

Respondents correctly observe that prior decisions of this Court require that the LHWCA be liberally construed in order to effectuate its remedial purposes.[22] Respondents accordingly argue that the Act should be interpreted in a manner which provides a complete and adequate remedy to an injured employee. Implicit in this argument, however, is the assumption that the sole purpose of the Act was to provide disabled workers with a complete remedy for their industrial injuries. The inaccuracy of this implicit assumption undercuts the validity of respondents' argument.

The LHWCA, like other workmen's compensation legislation, is indeed remedial in that it was intended to provide a certain recovery for employees who are injured on the job. It imposes liability without fault and precludes the assertion of various common-law defenses that had frequently resulted in the denial of any recovery for disabled laborers. While providing employees with the benefit of a more certain recovery for work-related harms, statutes of this kind do not purport to provide complete compensation for the wage earner's economic loss.[23] On the contrary, they provide employers with definite and lower limits on potential liability than would have been applicable in common-law tort actions for damages. None of the categories of disability covered by the LHWCA authorizes recovery measured by the full loss of an injured employee's earnings; even those in the most favored categories may recover only two-thirds of the actual loss of

[22] See, e. g., Reed v. The Yaka, 373 U. S. 410, 415 (1963); Voris v. Eikel, 346 U. S. 328, 333 (1953); Baltimore & Phila. Steamboat Co. v. Norton, 284 U. S. 408, 414 (1932).

[23] The LHWCA clearly does not attempt to compensate injured employees for their entire loss. In all four classes of disability covered by the Act, see n. 8, supra, the maximum compensation available is expressly designated to be less than an employee's actual economic loss. In this respect, the LHWCA is typical of most workmen's compensation statutes. See 1 A. Larson, supra n. 19, § 2.50, p. 11; Small, The General Structure of Law Applicable to Employee Injury and Death, 16 Vand. L. Rev. 1021, 1027–1028 (1963).

earnings. It therefore is not correct to interpret the Act as guaranteeing a completely adequate remedy for all covered disabilities. Rather, like most workmen's compensation legislation, the LHWCA represents a compromise between the competing interests of disabled laborers and their employers.[24] The use of a schedule of fixed benefits as an exclusive remedy in certain cases is consistent with the employees' interest in receiving a prompt and certain recovery for their industrial injuries as well as with the employers' interest in having their contingent liabilities identified as precisely and as early as possible.

It is true, however, that requiring resort to the schedule may produce certain incongruous results. Unless an injury

---

[24] The compromise nature of workmen's compensation legislation is well recognized:

"Workmen's compensation acts are in the nature of a compromise or quid pro quo between employer and employee. Employers relinquish certain legal rights which the law affords to them and so, in turn, do the employees. Employers give up the common-law defenses of the fellow servant rule and assumption of risk. Employees are assured hospital and medical care and subsistence during the convalescence period. In return for a fixed schedule of payments and a fixed amount in the event of the worker's death, employers are made certain that irrespective of their fault, liability to an injured workman is limited under workmen's compensation. Employees, on the other hand, ordinarily give up the right of suit for damages for personal injuries against employers in return for the certainty of compensation payments as recompense for those injuries." 1 M. Norris, The Law of Maritime Personal Injuries § 55, p. 102 (3d ed. 1975).

See also E. Blair, *supra* n. 20, § 1:00, pp. 1–1 to 1–2; W. Prosser, Law of Torts 531–532 (4th ed. 1971). This Court has previously recognized that the concept of compromise is central to the LHWCA, as adopted by the District of Columbia Workmen's Compensation Act:

"A prime purpose of the Act is to provide residents of the District of Columbia with a practical and expeditious remedy for their industrial accidents and to place on District of Columbia employers a limited and determinate liability." *Cardillo* v. *Liberty Mutual Ins. Co.*, 330 U. S., at 476.

results in a scheduled disability, the employee's compensation is dependent upon proving a loss of wage-earning capacity; in contrast, even though a scheduled injury may have no actual effect on an employee's capacity to perform a particular job or to maintain a prior level of income, compensation in the schedule amount must be paid. Conversely, the schedule may seriously undercompensate some employees like respondent Cross.[25] The result seems particularly unfair when his case is compared with an employee who suffers an unscheduled disability resulting in an equivalent impairment of earning capacity. Indeed, it is possible that the award for a serious temporary partial disability could exceed the amount scheduled for a permanent disability of like character.[26]

As this Court has observed in the past, it is not to be lightly assumed that Congress intended that the LHWCA produce incongruous results. *Baltimore & Phila. Steamboat Co.* v. *Norton,* 284 U. S. 408, 412–413 (1932). But if "compelling language" produces incongruities, the federal courts may not avoid them by rewriting or ignoring that language.

---

[25] Under the schedule, Cross is entitled to an award of approximately $3,200 to $12,800, depending upon the ultimate conclusion with respect to the degree of his disability. See n. 4, *supra.* Under § 8 (c) (21), in contrast, Cross was awarded $86.76 per week for the remainder of his working life, which, according to counsel in this case, could amount to well over $100,000. Brief for Petitioner 9; Tr. of Oral Arg. 10, 31, 34, 36. This dramatic disparity may be partially attributable to the fact that Cross received an exceptional amount of overtime compensation in the year preceding his injury.

[26] It is possible that, had Cross' disability been temporary in duration, he might have been entitled to a larger recovery than is available under the schedule for his permanent disability. On the basis of the evidence presented below, the maximum award available to Cross under the schedule is approximately $12,800. Because compensation for temporary partial disability under § 8 (e) is based upon lost wage-earning capacity rather than a schedule, Cross could have received approximately $22,400 for a temporary partial disability, assuming that the loss of wage-earning capacity demonstrated in this case was found to continue for the 5-year maximum temporary partial disability period. See 33 U. S. C. § 908 (e).

*Id.,* at 413. Such compelling statutory language is present in this case. See Part I, *supra.* The fact that it leads to seemingly unjust results in particular cases does not give judges a license to disregard it.[27]

If anomalies actually do occur with any frequency in the day-to-day administration of the Act, they provide a persuasive justification for a legislative review of the statutory compensation schedule. It would obviously be sound policy for Congress to re-examine the schedule of permanent partial disability benefits more frequently than every half century.[28] In such a re-examination the extent and importance of hypothetical cases such as those described by respondents could be fairly evaluated. In this judical proceeding, however, concern with such hypothetical cases is less compelling than sympathy for the actual plight of the individual litigant in the case before us. Nonetheless, that sympathy is an insufficient basis for approving a recovery that Congress has not authorized.

The judgment is

*Reversed.*

JUSTICE BLACKMUN, dissenting.

The Court in this case and the dissent in the Court of Appeals argue rather persuasively (but, for me, not convincingly) that, although they reach an incongruous result, see

---

[27] As THE CHIEF JUSTICE, writing for the Court, stated in another case in which plain statutory language led to a seemingly incongruous result:

"Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end." *TVA* v. *Hill,* 437 U. S. 153, 194 (1978).

[28] Compensation for permanent partial disability apparently presents particularly complex and troublesome problems in the workmen's compensation field. See generally Burton, *Permanent Partial Disabilities and Workers' Compensation,* 53 J. Urb. L. 853 (1976). Such problems are appropriately solved by legislative, not judicial, action. Although § 8 (c) has been amended in minor respects since its enactment, the present

*ante,* at 282–284, the statute is to be construed in favor of that incongruity and of the anomalies that concededly exist. It is said that this is so because Congress just wrote the statute that way. Now that the Court has so ruled, the Congress fortunately can remedy the anomalous situation if only it will go about doing it.

That, of course, is of no help or comfort to respondent Cross, the particular litigant here, who suffered the injury and who, as the Court concedes, *ante,* at 283, might have had a *greater* award had his injury been *less* enduring. That does not make much sense to me and, while I realize that statutory inequities occasionally exist in the area of workmen's compensation where seemingly arbitrary lines must be drawn somewhere, I cannot believe that by the language of this statute Congress intended such a result.

Soon after the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 44 Stat. (part 2) 1424, 33 U. S. C. §§ 901–950, became law in 1927, this Court unanimously announced the principles to be applied in resolving questions of statutory construction that arise under it:

> "The measure before us, like recent similar legislation in many States, requires employers to make payments for the relief of employees and their dependents who sustain loss as a result of personal injuries and deaths occurring in the course of their work, whether with or without fault attributable to employers. Such laws operate to relieve persons suffering such misfortunes of a part of the burden and to distribute it to the industries and mediately to those served by them. They are deemed to be in the public interest and should be construed liberally in furtherance of the purpose for which they were enacted and, if possible, so as to avoid incongruous or harsh results."

schedule is substantially identical to the schedule included in the Act in 1927.

*Baltimore & Phila. Steamboat Co.* v. *Norton,* 284 U. S. 408, 414 (1932).

See also *Voris* v. *Eikel,* 346 U. S. 328, 333 (1953).

Today's decision departs from these principles by reaching, rather than avoiding, a harsh and incongruous result.[1] It is undisputed that respondent Cross has suffered an injury that will reduce his weekly earnings by $130.13 for the rest of his working life. To compensate him for this injury, the Benefits Review Board awarded him two-thirds of his lost earnings—$86.76 per week or approximately $4,500 per year—for as long as he continues to work. Under the Court's decision, however, the most that Cross will receive is a *total* of about $12,800,[2] less than three years' compensation as awarded by the Board. If the Board now accepts petitioner's argument that Cross has lost only 5% of the use of his leg, he will

---

[1] The Court's decision also rejects the consistent interpretation of the Benefits Review Board, the agency which administers the LHWCA. In four cases, in addition to this one, the Board has ruled that the schedule of benefits set out in §§ 908 (c)(1) to (20) is not the exclusive method of compensation for an employee who suffers permanent partial disability from a scheduled injury. *Collins* v. *Todd Shipyards Corp.,* 9 BRBS 1015 (1979); *Brand* v. *Avondale Shipyards, Inc.,* 8 BRBS 698 (1978); *Richardson* v. *Perna & Cantrell, Inc.,* 6 BRBS 588 (1977); *Mason* v. *Old Dominion Stevedoring Corp.,* 1 BRBS 357 (1975). Cf. *American Mutual Ins. Co.* v. *Jones,* 138 U. S. App. D. C. 269, 426 F. 2d 1263 (1970); *Dugger* v. *Jacksonville Shipyards,* 8 BRBS 552 (1978), aff'd, 587 F. 2d 197 (CA5 1979); *Longo* v. *Universal Terminal & Stevedoring Corp.,* 2 BRBS 357 (1975) (employee who suffers permanent total disability due to a scheduled injury is not limited to compensation provided by the schedule).

[2] The Administrative Law Judge found that respondent Cross' average weekly wage was $332.48. The schedule of benefits provides that a worker who completely loses the use of a leg shall receive two-thirds of his average weekly wage for 288 weeks. § 908 (c)(2). Because Cross lost no more than 20% of the use of his leg, the most he can recover under the schedule is 20% of the compensation awarded for the total loss of the use of a leg. § 908 (c)(19). Therefore, the maximum amount available to him under the schedule is $332.48 × ⅔ × 288 × 20% = $12,767.23.

receive about $3,200, less than one year's compensation.[3] Of course, if Congress really intended such a result, the Court would be powerless to change it. I believe, however, that neither the language of the statute nor its legislative history warrants the interpretation that the Court adopts.

The starting point, of course, is the statute's definition of "disability." Section 2 (10) of the Act, 33 U. S. C. § 902 (10), defines "disability" as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." As used in the Act, therefore, "disability" is an economic concept, rather than a medical one. An injury is not compensable under the Act unless it results in some diminution in the employee's earning power.

Not surprisingly, then, the amount of compensation that the Act provides depends upon the amount of wages lost by the injured employee due to his injury. A worker who suffers permanent total disability, and therefore is unable to earn any wages, receives two-thirds of his average weekly wages. § 908 (a). One who suffers temporary total disability receives two-thirds of his average weekly wages as long as he remains disabled. § 908 (b). One who suffers temporary partial disability receives two-thirds of the difference between his average weekly wages before the injury and his wage-earning capacity after the injury, payable as long as the disability continues, but not longer than five years. § 908 (e).

The Act's treatment of permanent partial disability should be read against this background. As the Court notes, § 908 (c) contains 20 subsections establishing compensation for permanent partial disability caused by particular injuries. That compensation is two-thirds of the worker's weekly wages for a specified number of weeks for the injury listed. Subsection (21) then provides that "[i]n all other cases in this

---

[3] $332.48 $\times$ $\frac{2}{3}$ $\times$ 288 $\times$ 5% = $3,191.81.

class of disability" an employee shall receive two-thirds of the difference between his average weekly wages before the injury and his wage-earning capacity thereafter. The Court prefers to construe "other cases" to mean that the compensation specified for the injuries listed in subsections (1) to (20) is the exclusive method of compensating workers who are permanently, but partially, disabled by these injuries. I believe that "other cases" includes any case in which the worker does not wish to accept the compensation offered in subsections (1) to (20), but elects to bear the burden of proving the difference between his wages before the injury and his wage-earning capacity afterwards.

This interpretation is far more in harmony with the overall purpose of the Act than is the Court's construction. The House Committee that considered the legislation explained that workers' compensation "has come to be universally recognized as a necessity in the interest of social justice between employer and employee," and that this Act would provide an injured worker with "compensation *during the period of his illness or inability to pursue his usual employment . . . .*" (Emphasis added.) H. R. Rep. No. 1767, 69th Cong., 2d Sess., 19–20 (1927).[4] The compensation that the Court's decision provides to respondent Cross falls far short of this goal.

An additional purpose of the statute was to afford prompt relief to covered workers "without the delay and expense which an action at law entails." *Id.,* at 20. The inclusion of a schedule of benefits in § 908 (c) serves this goal by providing an easily ascertainable award to a person who suffers one of the scheduled injuries.[5] There is no indication in the

---

[4] It is significant that this language appears in the House Committee's Report, since that Committee amended the bill to provide for the schedule of benefits after it had passed in the Senate without a schedule. See 67 Cong. Rec. 10614 (1926).

[5] Compare S. Rep. No. 836, 81st Cong., 1st Sess., 17 (1949), discussing an amendment that provides a schedule of benefits, similar to that con-

legislative history, however, that providing prompt and certain relief is to be regarded as more important than providing adequate relief, especially in a case, such as this one, in which it is undisputed that the schedule of benefits will not com-

---

tained in the LHWCA, for the Federal Employees Compensation Act (FECA):

"Under the present act an employee may receive compensation to the extent of 66⅔ percent of whatever loss he has sustained in wage-earning capacity as caused by the injury. Unless the injury results in wage loss, no compensation can be paid. The absence of a schedule covering members and functions of the body has presented two principal difficulties, the first of which is the extreme difficulty in determining fairly and objectively the precise extent to which a particular physical impairment diminishes the injured employee's wage-earning capacity."

The Court of Appeals appropriately noted that on occasion the schedule may overcompensate a claimant. For example, a lawyer who loses an arm due to an accident at work may not suffer any diminution in his earning ability, but he would be eligible for compensation under the schedule. 196 U. S. App. D. C. 417, 421, n. 28, 606 F. 2d 1324, 1328, n. 28 (1979). To this extent, the schedule is an exception to the principle that disability is an economic concept rather than a medical one, but it is an exception that Congress deliberately chose to make. In addressing the second of the "principal difficulties" presented by the then absence of a schedule in the FECA, the Senate Report concluded:

"A particular physical impairment to a member or function of the body does not always cause a proportional reduction in earning capacity. An employee having a loss of a member or function may be able to return to employment without apparent wage loss. In that event, notwithstanding the severe physical loss to him, he may not under the present act be paid compensation for his physical impairment. It is understandable that employees with such losses expect some form of indemnity for their loss." S. Rep. No. 836, at 17.

In relying upon this legislative history of the FECA, I do not mean to suggest that that history is part of the legislative history of the LHWCA. As the Court notes, *ante*, at 275, the legislative history of the LHWCA is silent concerning the reasons why Congress included a schedule. Although Congress' intent in this matter cannot be discerned with absolute certainty, it is plausible that its reasons for adopting a schedule for the FECA were the same as its reasons for having one for the LHWCA.

pensate respondent Cross for the wages he has lost and will lose because of his injury.

Although the Court states that the "weight of judicial authority" supports its view, it is able to cite only a single Federal District Court decision in point,[6] namely, *Williams v. Donovan,* 234 F. Supp. 135 (ED La. 1964), aff'd, 367 F. 2d 825 (CA5 1966), cert. denied, 386 U. S. 977 (1967).[7] This contrasts with the consistently held view of the Benefits Review Board,[8] the agency established to administer the LHWCA. *Sokolowski* v. *Bank of America,* 261 N. Y. 57, 184 N. E. 492 (1933), of course, provides scant support for today's decision. That case was decided after the LHWCA was enacted, and is an uncertain guide, at best, to the intent of the Congress that passed the Act six years earlier.

Thus, the anomalous results the Court's decision imposes upon respondent Cross and other claimants under the LHWCA[9] are not mandated, in my view, by the statute. It

---

[6] The other federal cases cited by the Court are clearly distinguishable. In *Flamm* v. *Hughes,* 329 F. 2d 378 (CA2 1964), the court rejected a claim that it was unconstitutional for Congress to provide a schedule for some injuries, but not for others. The plaintiff, however, was dissatisfied with the award obtained under § 908 (c) (21), and hoped to obtain a larger award from a schedule. The court did not address the question whether the schedule provides an exclusive remedy for a claimant who can prove a wage loss greater than that specified by the schedule. The Court acknowledges that *Travelers Ins. Co.* v. *Cardillo,* 225 F. 2d 137 (CA2), cert. denied, 350 U. S. 913 (1955), which held that proof of lost wages is irrelevant when an employee seeks to recover under the schedule, did not decide the question before us. *Ante,* at 277, n. 15.

[7] The one paragraph *per curiam* affirming the District Court's decision in *Williams* does not discuss the exclusivity issue.

[8] See n. 1, *supra.*

[9] The inadequate compensation awarded to respondent Cross is only one of a number of peculiarities resulting from today's decision. Under the rule announced by the Court, a person who suffers a temporary partial disability may receive more compensation than one who suffers a like but permanent partial disability, even though the latter injury is obviously more serious and will cause a greater loss of earnings. In this case, if

is possible to construe the statute to allow a claimant seeking compensation for permanent partial disability to choose between the schedule and the provisions of § 908 (c)(21). I think we should follow *Baltimore & Phila. Steamboat Co.* v. *Norton*, 284 U. S. 408 (1932), and adopt a liberal construction of the statute so as to avoid the amazingly incongruous result approved by the Court.

I would affirm the judgment of the Court of Appeals.

---

Cross' injury were a temporary partial disability, he would be entitled to receive two-thirds of his lost earning capacity for a maximum of five years. § 908 (e). Thus, he could receive a total of about $22,400 ($86 per week for five years), an amount almost twice as large as the maximum compensation that the Court now allows him for his *permanent* partial disability. "It may not reasonably be assumed that Congress intended to require payment of more compensation for a lesser disability than for a greater one including the lesser. Nothing less than compelling language would justify such a construction of the Act." *Baltimore & Phila. Steamboat Co.* v. *Norton*, 284 U. S. 408, 413 (1932).

Today's decision also creates a significant *disincentive* for the seriously injured workers who otherwise might wish to return to work. The courts and the Benefits Review Board have held that a worker who is unable to do any work as the result of a scheduled injury may be compensated for permanent total disability, and the Court does not question this rule. See *ante*, at 277–278, n. 17. A worker who has been permanently and totally disabled receives two-thirds of his average weekly wages. § 908 (a). A worker who takes a low-paying job because a scheduled injury makes him unable to work at his old job will be considered permanently partially disabled. His compensation will be limited to the scheduled amount, even though that amount may be insufficient to make up the difference between his former earnings and his earnings at the new job. Such a worker will learn quickly that it is to his advantage not to attempt to do any work. See *Mason* v. *Old Dominion Stevedoring Corp.*, 1 BRBS, at 365; *Brandt* v. *Avondale Shipyards, Inc.*, 8 BRBS, at 701–702.