**PARKLANDS, INC. and Commercial Union Companies, Petitioners,**

v.

**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, U.S. DEPARTMENT OF LABOR, Respondent,**

**Linda L. Jones, Intervenor.**

**No. 88–1370.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 9, 1989.

Decided June 23, 1989.

Thomas J. Schetelich, Baltimore, Md., with whom Donald R. Allen was on the brief, for petitioners.

John F. Calabrese, College Park, Md., for intervenor.

John Jeffrey Ross, Atty., U.S. Dept. of Labor, entered an appearance for respondent.

Before MIKVA, EDWARDS and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This is a workers' compensation case in which an employer, Parklands, Inc. ("Parklands"), and its insurer, Commercial Union Companies ("Commercial Union"), petition for review of a decision of the U.S. Department of Labor's Benefits Review Board ("Board"). The Board affirmed the award by an administrative law judge ("ALJ") to the claimant, Ms. Linda Jones, of benefits for temporary total disability dating from November 15, 1982 (except for those periods during which she was working) and all associated medical expenses. We uphold the Board's conclusion that the claimant was temporarily totally disabled as of November 15, 1982, but we grant the petition of review with respect to the medical expenses because we find that the claimant neither sought nor obtained petitioners' written authorization before seeking certain types of medical care, as required by statute and applicable regulations.

## I.

Ms. Jones brought her claim under the District of Columbia Workmen's Compensation Act, 36 D.C.Code § 501 et seq. (1973), which until its amendment in 1980 embodied the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 ("Act"). In 1979, Ms. Jones worked as a resident manager at the Parklands apartment complex, when on March 22 she injured her right shoulder while breaking up an altercation between two tenants. Ms. Jones continued to work at Parklands until January 1980, when she left to accept a position with Monocle Management Ltd., as the resident manager of its Lancaster Square complex. Her tasks included leasing apartments, collecting rent, and supervising maintenance workers and grounds keepers. She performed her job well, and in April 1983 she was offered a promotion to become the resident manager of the substantially larger Oxford Knolls apartment complex. She worked there for about three months and then was dismissed, because, as the company head later testified, "it was just too much for her at that time in her career." Claimant apparently has not been able to work since that time.

After her injury in 1979, Ms. Jones initially was treated by Dr. Frohman, who placed her right arm in a sling, gave her injections of cortisone, and administered whirlpool therapy. Dr. Frohman referred her to an orthopedic surgeon, Dr. Phillips. At the time of her first visit on April 17, 1979, Dr. Phillips believed that claimant had suffered an injury to the rotator cuff in her right shoulder. Later x-rays, however, revealed no abnormalities in that shoulder. Dr. Phillips continued to treat Ms. Jones until May 31, 1979, when he discharged her because she refused to undergo a diagnostic test to determine the nature of the damage to her shoulder.

Ms. Jones nonetheless returned to Dr. Phillips in February 1980, complaining of pain in her neck and right shoulder. Tests, including an arthrogram and an electro-diagnostic study, were normal. Dr. Phillips concluded that the claimant was suffering from a severe psychological reaction to her injuries. He last saw Ms. Jones on May 29, 1980, and advised her that she could continue to work. He told her that he wanted to see her again in a month, but she never returned.

In August 1981, another orthopedic surgeon, Dr. Gordon, examined Ms. Jones at the request of petitioners. He found no evidence of injury to her right shoulder, and concluded that Ms. Jones was "voluntarily promoting her complaints" and required no further treatment for the accident.

In the fall of 1981, Ms. Jones saw Dr. Greaves, who had previously treated her for high blood pressure. Dr. Greaves referred her to Dr. Jaller, an orthopedic surgeon, who again ordered tests of Ms. Jones' right shoulder. Dr. Jaller concluded that she did not suffer from a rotator cuff tear, but instructed her to exercise her shoulder regularly. He hoped to rehabilitate her so that she would be able to "function in a job situation."

The Department of Labor referred claimant to two doctors. Dr. Kindred examined Ms. Jones in March 1982, determined that "she probably has significant rotator cuff injury," and rated her shoulder disability at 50 percent. Dr. Schonholtz examined Ms. Jones on August 12, 1982 and evaluated her disability at 15 percent. He also believed that she could continue working full-time. Dr. Schonholtz surmised that Ms. Jones had a "frozen shoulder," which meant that scar tissue in and around the shoulder prevented it from moving through a full range of motion. Dr. Schonholtz urged Ms. Jones to undergo a treatment in which she would be given anaesthesia and her shoulder manipulated in order to break the scar tissue. She refused. In May 1983, Dr. Schonholtz examined Ms. Jones again and declared that she was much improved, as her range of motion had doubled since her last visit.

In November 1982, Dr. Kindred referred Ms. Jones to Dr. Ignacio, who is not an orthopedic surgeon. Dr. Ignacio determined that Ms. Jones suffered from chronic muscle strain to her right shoulder and an inflammation of the soft tissue surrounding the shoulder. A thermographic test performed in December 1982 confirmed this conclusion. Dr. Ignacio saw claimant again in January 1983 and re-affirmed his earlier diagnosis. Ms. Jones received physical therapy for three weeks and was fitted for a shoulder brace. Dr. Ignacio also recommended that Ms. Jones attend a pain clinic called "Wellness Enterprises," which apparently specializes in hypnotic therapy.

By April, Dr. Ignacio noticed that the condition of the shoulder was deteriorating.

On July 21, 1983, Ms. Jones was admitted to Greater Southeast Community Hospital, complaining of acute pain in her right shoulder. She was hospitalized for about two weeks and received medications and physical therapy. After her release, Dr. Ignacio recommended manipulation under anaesthesia, as Dr. Schonholtz had urged earlier. Again, however, Ms. Jones refused treatment. Instead, Dr. Ignacio referred her to Dr. Seelig, a clinical psychologist, who diagnosed Ms. Jones as suffering from depression.

Ms. Jones brought a workers' compensation action against Parklands and Commercial Union in the fall of 1983. A hearing was held on March 1, 1984, and on August 9 the ALJ issued a decision in her favor, finding that she had been temporarily totally disabled since November 15, 1982, and awarded her $220.40 per week in benefits and all related medical expenses. Petitioners appealed to the Benefits Review Board, which on March 31, 1988 sustained the ALJ's determination. Parklands and Commercial Union then filed a timely petition for review in this court.

## II.

### A.

Petitioners urge us to overturn the Board's decision that Ms. Jones has been temporarily totally disabled since November 15, 1982. We cannot reverse the ALJ and the Board on a question of fact unless their findings are unsupported by substantial evidence in the record as a whole. *See* 33 U.S.C. § 921(b)(3); *Hensley v. WMATA,* 655 F.2d 264, 267 (D.C.Cir.1980), *cert. denied,* 456 U.S. 904, 102 S.Ct. 1749, 72 L.Ed. 2d 160 (1982); *Hullinghorst Industries, Inc. v. Carroll,* 650 F.2d 750, 759 (5th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982). We find that the decision in this case was supported by substantial evidence.

■ Petitioners first maintain that Ms. Jones' injury was not the proximate cause of her unemployment. They point to the fact that she worked at Parklands for almost a year after her injury, and left only to take another job as a resident manager

with a different company. According to her employer at Monocle Management, Dr. Simkowitz, she was an "excellent" worker at the Lancaster complex, and was dismissed only because she had been promoted too quickly to a job that she was incapable of performing. Dr. Simkowitz testified that "[t]he issue never came up that she had any physical problems. * * * I never [heard] of it until ten minutes before this deposition. I never knew she had a shoulder problem."

The ALJ, however, did not need to rely on claimant's employment record alone to find a disability. Rather, he determined on the basis of medical evidence, primarily Dr. Ignacio's testimony, that Ms. Jones' shoulder condition had worsened, and that she was totally disabled at the time she left Monocle Management, even though her departure was not necessarily caused by her medical condition. There was of course conflicting expert testimony, but the ALJ was entitled to credit Dr. Ignacio's views over those of the other doctors, even though Dr. Ignacio is not an orthopedic surgeon. *See Atlantic Marine, Inc. v. Bruce*, 661 F.2d 898, 900 (5th Cir.1981).

Petitioners also introduced before the ALJ hospital records dated September 15, 1983, ostensibly indicating that Ms. Jones was employed as a "certified manager" for "Odem and Odem Enterprises," together with photographs allegedly showing Ms. Jones carrying a package with her injured right arm. Although the ALJ did not explicitly reject the hospital records evidence, the Board decided that "[s]ince the administrative law judge credited claimant's testimony as to the last day that she was able to work, we reject th[e] argument [that the records indicated she was not disabled]." *Linda Jones v. Parklands, Inc. and Commercial Union Insurance Co.*, BRB No. 84-1953, at 3 (Mar. 31, 1988). The Board also found that the ALJ acted sensibly in rejecting the photographs as evidence of non-disability, on the ground that even if they depicted Ms. Jones, the weights of the packages shown were unknown, *see id.* We cannot upset the Board's determinations as unreasonable.

■ In addition, petitioners take issue with the ALJ's conclusion, affirmed by the Board, that Ms. Jones was temporarily totally disabled beginning on November 15, 1982, except for the periods in which she worked. According to petitioners, no medical evidence supported the ALJ's determination as to the date of disability. The testimony in the hearing was ambiguous, however, and we cannot agree that no witnesses supported the date selected by the ALJ. Claimant's counsel asked Dr. Ignacio, "[F]rom this point backward, for what period of time was she not able to work or temporarily totally disabled?" Dr. Ignacio replied, "From the time I saw her [November 1982], she was having problems with working, and she barely managed to be able to work." Later, after a discussion of permanent—not temporary—disability, Dr. Ignacio fixed the date when Ms. Jones became "totally disabled" as August 25, 1983. The ALJ could reasonably have concluded that Ms. Jones became temporarily totally disabled in November 1982, although she did not become permanently disabled until later.

Other evidence in the record supported the November 1982 date. Claimant herself testified that because of her injury she had missed work from December 1 to 10, 1982; from January 3 to 23, 1983; from February 7 to March 13, 1983; from April 18 to 22, 1983; from May 2 to 13, 1983; and from June 10, 1983 onward. The ALJ was not required to base his decision exclusively on medical testimony. "He properly could, as he did, consider and rely upon his own observations and judgment in connection with all the evidence before him * * *." *White v. Newport News Shipbuilding & Dry Dock Co.*, 633 F.2d 1070, 1075 (4th Cir.1980); *cf. Todd Shipyards Corp. v. Donovan*, 300 F.2d 741, 742 (5th Cir.1962) (John Minor Wisdom, J.) ("fact-finders are not bound to decide according to doctors' opinions if rational inferences lead in the other direction").

### B.

■ The Board also held that petitioners were obligated to pay claimant's medical expenses involving Dr. Ignacio, Greater Southeast Community Hospital, and Dr. Seelig, a total of $11,756.75 at the time of the hearing, on the ground that petitioners

were aware of the treatment yet made no statement explicitly disavowing financial responsibility for it. We find that petitioners were not so obligated, because Commercial Union designated Dr. Schonholtz as the treating physician, and Ms. Jones and her attorney failed both to request and to obtain written authorization before switching to another doctor.

The ALJ maintained that an exchange of letters between counsel demonstrated "that the employer accepted Dr. Ignacio as the treating physician of the claimant." On January 5, 1983, claimant's attorney sent a report from Dr. Ignacio to the U.S. Department of Labor and to petitioners' attorney, with an attached letter that read in its entirety:

> Please accept this letter as a request to reopen the above captioned case based upon a change or worsening condition. I am enclosing a letter from a Dr. Daniel Ignacio, indicating that Ms. Jones is temporarily totally disabled from work due to continuing problems with her shoulder resulting from the original compensation injury of March 22, 1979.

Petitioners' counsel responded the next day with a letter that stated in relevant part:

> By copy of this letter to [claimant's attorney] I would ask that he supply me with greater particulars of this renewed claim including present employer, days missed, present salary, nature and extent of claimed injury, and any other details of the present matter. I also believe that my clients are entitled to a much more extensive and complete report from Dr. Ignacio evidencing the injury, its extent, its nature, the symptoms and signs related to the claim, causes for her present condition, and any other important details. Only then of course would my clients be in a position to consider her further claim for benefits. I am sure also that my clients will want to have the claimant re-examined.

In addition, the ALJ relied on a variety of circumstantial evidence in the record to conclude that Commercial Union had impliedly consented to the treatment. Both Dr. Ignacio and Dr. Seelig testified at the hearing that their normal business practice was to contact the appropriate insurance carrier and request authorization before they treated a patient, although neither could say that such procedures had been followed in Ms. Jones' case or that any specific authorization had been obtained. On February 23, 1983, Commercial Union's claims supervisor sent a letter to Dr. Ignacio requesting more information concerning Wellness Enterprises, the pain clinic to which Dr. Ignacio referred Ms. Jones. The letter advised that the supervisor had attempted to contact the clinic by phone but had received no answer:

> I would appreciate it if you could provide me with a full address of this institute and also if you have any brochures or any sort of references with regards to Wellness Enterprises could you please provide us with copies[?]

Finally, some of Ms. Jones' records at Greater Southeast Community Hospital listed "Commercial" as her insurance carrier. From this the ALJ inferred that the hospital had contacted Commercial Union, and that the carrier was aware of all the treatment she received, even though other records specified claimant's carrier as "Other," and still other forms indicated "self pay."

Even if we were to accept the ALJ's factual findings, we cannot countenance his legal conclusion, with which the Board agreed, that mere knowledge of the medical care on the part of petitioners created an obligation to pay for it. We owe no deference to either the ALJ or Board on issues of law, *see Potomac Electric Power Co. v. Director, OWCP,* 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514 n. 185, 66 L.Ed.2d 446 (1980). The ALJ's theory of "implied consent" finds no support in either the statute or accompanying regulations, which require a *request* by the claimant for treatment and *written authorization* by the employer, insurer, or U.S. Department of Labor. "Although the Act should be interpreted liberally [in order to favor claimants], the plain terms of the statute may not be disregarded." *Maryland Shipbuilding and Drydock Co. v. Jenkins,* 594 F.2d 404, 406 (4th Cir.1979) (citing *Pillsbury v. United Engineering Co.,* 342 U.S. 197, 200, 72 S.Ct. 223, 225, 96 L.Ed. 225 (1952)).

At the time of the events in question the Act provided that:

An employee shall not be entitled to recover any amount expended by him for medical or other treatment or services *unless he shall have requested the employer to furnish such treatment or services, or to authorize provision of medical or surgical services by the physician selected by the employee,* and the employer shall have refused or neglected to do so, or unless the nature of the injury required such treatment and services and the employer or his superintendent or foreman having knowledge of such injury shall have neglected to provide or authorize the same.

33 U.S.C. § 907(d) (1982) (emphasis added). The relevant regulations provided:

Whenever the nature of the injury is such that immediate medical care is required and the injured employee is unable to select a physician, the employer shall select a physician. Thereafter the employee may change physicians when he is able to make a selection. *Such changes shall be made upon obtaining written authorization* from the employer or, if consent is withheld, from the deputy commissioner.

20 C.F.R. § 702.405 (1983) (emphasis added).

Whenever the employee has made his initial, free choice of an attending physician, *he may not thereafter change physicians without the prior written consent of the employer (or carrier) or the deputy commissioner.* Such consent shall be given in cases where an employee's initial choice was not of a specialist whose services are necessary for, and appropriate to, the proper care and treatment of the compensable injury or disease. In all other cases, consent may be given upon a showing of good cause for change.

20 C.F.R. § 702.406 (1983) (emphasis added).

There is little question that Ms. Jones neither requested nor obtained written authorization from petitioners or from the Department of Labor. The January 5, 1983 letter from claimant's attorney merely notified the insurer and employer of the claim; it did not seek authorization for treatment by Dr. Ignacio. Likewise, petitioners' reply of January 6 simply requested more details about the claim and did not purport to authorize treatment. The February 23 letter from Commercial Union was a preliminary inquiry seeking basic information regarding Wellness Enterprises. Later communications, moreover, clearly indicated that petitioners did not consent to Dr. Ignacio's treatment. On May 18, 1983, for example, petitioners' counsel wrote to the Department of Labor and to Ms. Jones' attorney, stating that "Commercial Union will pay for these procedures by *Dr. Schonholtz.* It will *not* pay for these treatments being done by any other doctor and it intends to contest medical treatment by any other physician. * * * As is clear, Commercial Union has no intention of paying for these procedures by any other doctor." (emphasis in original). On October 20, 1983, petitioners' counsel again wrote to the Department of Labor, urging it to order Ms. Jones to return to the care of Dr. Schonholtz. Because the requirements of the statute and regulations were not fulfilled in this case, the ALJ and Board should not have ordered petitioners to reimburse Ms. Jones for the medical expenses in dispute.

### CONCLUSION

We uphold the determination that Ms. Jones was temporarily totally disabled as of November 15, 1982, but we find that the Board erred in affirming the ALJ's award of medical expenses to her. We conclude that Ms. Jones is not entitled to be reimbursed for treatment by Dr. Ignacio, Greater Southeast Community Hospital, or Dr. Seelig.

Claimants in Ms. Jones' position are not without remedies in seeking reimbursement for medical expenses. If an employer or carrier refuses a written request for authorization to seek treatment, that refusal can be reviewed by the Department of Labor under section 907(d) of the Act and 20 C.F.R. Part 702; if an employer or insurer unreasonably delays in acting on a request for authorization, that may in some situations be deemed a constructive denial.

This case, however, does not present either such alternative.

The petition for review is granted as to medical expenses, and denied as to disability and disability payments.

*It is so ordered.*