**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,**

v.

**DETROIT HARBOR TERMINALS, INC.; Utica Mutual Insurance Company; and General Reinsurance Company, Respondents.**

No. 86–3606.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 3, 1987.

Decided June 24, 1988.

Rehearing and Rehearing En Banc Denied Sept. 21, 1988.

Joshua T. Gillelan, II (argued), George R. Salem, Donald S. Shire, U.S. Dept. of Labor, Linda Meekins, Benefits Review Bd., Washington, D.C., for petitioner.

Robert H. Fortunate (argued), Foster, Meadows, & Ballard, Robert Howes, Detroit, Mich., for respondents.

Before ENGEL, Chief Judge,[*] and KRUPANSKY and NELSON, Circuit Judges.

ENGEL, Chief Judge.

This appeal presents the question whether the special fund created by the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) or the employer and insurer of an injured worker should pay the increased death benefits to that worker's family that are due under the LHWCA Amendments of 1972, Pub.L. No. 92–576, 86 Stat. 1251 (codified at 33 U.S.C. §§ 901–950, 1982), when the worker was totally, permanently disabled before the effective date of the amendments, but did not die as a result of that disability until September 1, 1980, well after the effective date. We conclude that congressional intent supports the view that the special fund is to bear responsibility for the increased death benefits.

### I.

The first version of the Longshoremen's Act was adopted in 1927, Ch. 509, 44 Stat. 1424. While the Act has been modified several times since, the most sweeping changes occurred by adoption of the 1972 amendments, Pub.L. No. 92–576, 86 Stat. 1251.[1] The amendments both broadened the scope of the Act's coverage and increased the amount of benefits available to injured workers.

The amended version of 33 U.S.C. § 906 sets out the maximum benefits that may be paid for total disability. Under pre–1972 law, compensation was not to exceed $70/week, Pub.L. No. 87–87, 75 Stat. 203 (1961). However, the amendments replaced this rigid ceiling with a sliding scale of maximum benefits, tied to the national average weekly wage.[2]

---

[*] The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988.

1. While portions of the Act have been amended numerous times, the significant overhauls that the Act has undergone can be found at Pub.L. No. 75–727, 52 Stat. 1164 (1938); Pub.L. No. 80–757, 62 Stat. 602 (1948); Pub.L. No. 84–803, 70 Stat. 654 (1956).

2. 33 U.S.C. § 902(19) defines this as "the national average weekly earnings of production or nonsupervisory workers on private nonagricultural payrolls." Under the revised section 906, claimants may receive:

(A) 125 per centum or $167, whichever is greater, during the period ending September 30, 1973.

(B) 150 per centum during the period beginning October 1, 1973, and ending September 30, 1974.

While section 906 fixes a maximum possible compensation, section 908, providing the method for calculating the benefits to be paid in a specific case, remained basically unchanged by the 1972 amendments: "[i]n case of total disability adjudged to be permanent 66⅔ per centum of the average weekly wages shall be paid to the employee during the continuance of such total disability." The wages referred to in section 908 are the wages the employee was earning at the time of his accident.

Section 909, which discusses death benefits, was also changed by the 1972 amendments. While the previous section 909 only covered injuries which caused death, the new provision also extends benefits to cover permanently, totally disabled workers, even if the cause of death is unrelated to the disability. The amendments also increase the death benefit from 35% to 50% of average weekly wages. Further, while the pre–1972 section 909 had limited death benefits to a maximum of $36.75/week,[3] the new section only limits benefits to the average weekly wages of the deceased. 33 U.S.C. § 909(e).

The most relevant change in the Longshoremen's Act, for our purposes, was the addition of 33 U.S.C. § 910(f)–(h). Section 910(f) is essentially a cost-of-living increase provision. It states that all death or disability awards made after the effective date of the 1972 amendments shall be adjusted annually, to increase in proportion to any increase in the national weekly wage. Section 910(g) merely states that award changes should be rounded off to the nearest dollar and that the annual adjustments cannot be used to cause benefits to decline.

Section 910(h) merits setting out in full:

(1) Not later than ninety days after October 27, 1972, the compensation to which an employee or his survivor is entitled due to total permanent disability or death which commenced or occurred prior to October 27, 1972, shall be adjusted. The amount of such adjustment shall be de-termined in accordance with regulations of the Secretary by designating as the employee's average weekly wage the applicable national average weekly wage determined under section 906(b) of this title and (A) computing the compensation to which such employee or survivor would be entitled if the disabling injury or death had occurred on the day following October 27, 1972 and (B) subtracting therefrom the compensation to which such employee or survivor was entitled on October 27, 1972; except that no such employee or survivor shall receive total compensation amounting to less than that to which he was entitled on October 27, 1972. Notwithstanding the foregoing sentence, where such an employee or his survivor was awarded compensation as the result of death or permanent total disability at less than the maximum rate that was provided in this chapter at the time of the injury which resulted in the death or disability, then his average weekly wage shall be determined by increasing his average weekly wage at the time of such injury by the percentage which the applicable national average weekly wage has increased between the year in which the injury occurred and the first day of the first month following October 27, 1972. Where such injury occurred prior to 1947, the Secretary shall determine, on the basis of such economic data as he deems relevant, the amount by which the employee's average weekly wage shall be increased by the pre–1947 period.

(2) Fifty per centum of any additional compensation or death benefit paid as a result of the adjustment required by paragraphs (1) and (3) of this subsection shall be paid out of the special fund established under section 944 of this title, and 50 per centum shall be paid from appropriations.

(C) 175 per centum during the period beginning October 1, 1974, and ending September 30, 1975.

(D) 200 per centum beginning October 1, 1975.

3. This figure represents 35% of the maximum allowable wage of $105/week as provided under the former section 909.

(3) For purposes of subsections (f) and (g) of this section an injury which resulted in permanent total disability or death which occurred prior to October 27, 1972 shall be considered to have occurred on the day following such date.

In brief, section 910(h)(1) provides that recipients of disability or death benefits arising from accidents that occurred prior to the effective date of the 1972 amendments shall have their compensation brought into line with post–1972 recipients by adding to their existing benefits the difference between their present benefits and the benefits they would have received had the accidents been post–1972.[4] Section 910(h)(2) states that the adjustments to benefits are to be funded one half from appropriations and one half from the "special fund." Finally, section 910(h)(3) provides that benefit adjustments under 910(h)(1) shall be subject to section 910(f) annual adjustment in the same way that all post–1972 benefits are.

33 U.S.C. § 944(c) provides the means for replenishment of the fund. These consist of death benefits payable when there is no beneficiary,[5] fines and penalties collected under the Act, and proportionate levies upon insurance carriers and self-insured companies, based upon their previous use of the special fund.

## II.

The facts here are not in dispute. On October 23, 1969 Charles Dennis was injured during the course of his employment with Detroit Harbor Terminals. This accident, which caused him to have frequent and serious seizures, was found to be totally disabling. At the time of his accident he had been earning $138/week. Thus, under the pre–1972 Act he was entitled to and received $70/week disability benefits.

Following the 1972 amendments, Dennis was able to increase his benefits pursuant to 33 U.S.C. § 910(h)(1). He also received annual increases through application of sections 910(h)(3) and 910(f). His employer and insurance carrier were reimbursed by the special fund for all payments that they made following the effective date of the amendments that were in excess of $70/week.

Following Dennis' death on September 1, 1980, the Deputy Commissioner for the Tenth Compensation District issued a compensation order on November 4, 1980, changing Dennis' award from Permanent Total Disability Benefits to Death Benefits. Applying 33 U.S.C. § 909, the Commissioner found that Dennis' beneficiaries were entitled to 50% of the national average weekly wage at the time of his death ($213.13) plus a 7.03% annual adjustment effective October 1, 1980. This brought Dennis' beneficiaries' benefits to $114/week. The deputy commissioner found that Detroit Harbor Terminals and its insurance carrier were fully liable for the death benefits. However, he held that Detroit Harbor Terminals should be reimbursed for the annual adjustments made to the award under 910(h)(3) and 910(f).

Detroit Harbor Terminals appealed, claiming that since Dennis' death arose out of his pre–1972 injury, the death benefits paid in excess of $70/week should be reimbursed by the special fund. This matter was considered by Administrative Law Judge Rhea M. Burrow on June 9, 1982. He denied the appeal, stating:

the award to the Claimant/Widow based on liability for death benefits which came into existence only upon death of the decedent Dennis, pursuant to Section 9 of the amended Act (33 U.S.C. 909) is not shown as being applied retroactively and is independent of the liability for disability benefits occasioned by the earlier (1969) injury.

Detroit Harbor Terminals then appealed to the Benefits Review Board. In a per curiam opinion issued on May 5, 1986, the

---

**4.** All of these adjustments are made through the use of the national average weekly wage. The precise formulas for calculating benefit increases do not affect the outcome of this case, so they are not discussed in full.

**5.** Rather than requiring payment of a full death benefit, the fund requires a payment of $5,000. 33 U.S.C. § 944(c)(1).

Board reversed the decision of the ALJ. The Board pointed to two of its previous opinions, *Hernandez v. Base Billeting Fund, Laughlin Air Force Base,* 13 BRBS 214 (1980), *on recon.* 13 BRBS 220 (1981); and *Silberstein v. Service Printing Co.,* 2 BRBS 143 (1975), for the proposition that section 910(h) applies when injury occurs prior to the amendments but only becomes disabling after the amendments. The Board went on to say:

> Consistent with these cases, we hold that Section [9]10(h) applies to cases where injury occurs pre-amendment and death occurs post-amendment. There is no basis for distinguishing cases where pre-amendment injury results in post-amendment disability from those where death occurs post-amendment. Both disability and death claims arise from the employee's injury. The language of Section [9]10(h) refers to both permanent total disability *and* death, and the rationale of *Hernandez* and *Silberstein* applies equally to both.

The Director contests this ruling, claiming that it goes against the clear meaning of the statute. He has thus initiated this appeal.

### III.

#### A. Standard of Review

In considering decisions of the Benefits Review Board, our court undertakes a limited review. We stated in *Gibas v. Saginaw Mining Co.,* 748 F.2d 1112, 1116 (6th Cir.1984), that "[o]ur review is limit ed to 'scrutiniz[ing] Board decisions for errors of law and for adherence to the statutory standard governing the Board's review of the administrative law judge's factual determinations.'" (citations omitted). *See, e.g., Engle v. Director, Office of Workers' Comp. Prog.,* 792 F.2d 63, 64 (6th Cir.1986) ("Our function is only to see that the decision of the ALJ and Board was supported by substantial evidence.").

Our inquiry, although limited, is not deferential to the Board's decision below. The Supreme Court has stated that "the Benefits Review Board is not a policymaking agency; its interpretation of the LHWCA thus is not entitled to any special deference from the courts." *Potomac Electric Power Co. v. Director, Office of Workers' Comp. Prog.,* 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514 n. 18, 66 L.Ed.2d 446 (1980). We have recently echoed this sentiment. *Saginaw Mining Co. v. Mazzulli,* 818 F.2d 1278, 1283 (6th Cir.1987). However, the Ninth Circuit has held that "[t]his court has, however, indicated that it will respect the Board's interpretation of the Longshore Act 'where that interpretation is reasonable and reflects the policy underlying the statute.'" *Kaiser Steel Corp. v. Director, Office of Workers' Comp. Prog.,* 812 F.2d 518, 521 (9th Cir.1987) (quoting *National Steel and Shipbuilding Co. v. United States Dept. of Labor,* 606 F.2d 875, 880 (9th Cir.1979)); *Long v. Director, Office of Workers' Comp. Prog.,* 767 F.2d 1578, 1580 (9th Cir.1985).

It is unclear whether the Director is entitled to greater deference than the Board. We have held that "the interpretation put on a statute by the agency charged with administering it is entitled to some deference...." *In Re Oliver M. Elam, Jr., Co.,* 771 F.2d 174, 181 (6th Cir.1985). Here, the Employment Standards Administration of the Office of Workers' Compensation Programs processed the original claim for benefits. However, this agency is infrequently called upon to engage in statutory interpretation. In *Director, Office of Workers' Comp. Prog. v. O'Keefe,* 545 F.2d 337, 343 (3d Cir.1976), the court stated:

> Based upon our reading of the statute, we conclude that neither the Director of the Office of Workmen's Compensation Programs nor the Benefits Review Board is entitled to "great deference" in the interpretation of the 1972 amendments.... First, neither the Director nor the Board is the officer or agency charged with the administration of the statute. While the Director is authorized by Congress to administer the statute he does not resolve disputed legal issues involving the LHWCA. Substantial questions of law arising in an adversarial context are specifically reserved for decision first by administrative law judges

and then by the Board. Moreover, the Board is only a quasi-judicial body presented with select cases and not an agency involved in the overall administration of the statute. Congress has thus divided the various functions involved in administering the statute between the two different arms of the Department of Labor. We know of no authority which would require judicial deference to either one arm or the other under these circumstances.

Since neither agency is entitled to particular deference, it is necessary to examine the language of the statute. If we conclude that the statutory language is unambiguous, we must adopt that construction of the statute. However, if we find the language to be ambiguous, we must then turn to the legislative history and underlying purpose of the Longshoremen's Act to determine the correct interpretation.

### B. Interpretation of the Longshoremen's Act

The language of 33 U.S.C. § 910(h)(1), read in conjunction with the rest of the Longshoremen's Act, fails to indicate with certainty whether Congress intended that death benefits awarded post-amendment from a pre-amendment injury should entitle the insurance carrier and employer to reimbursement from the special fund. In this regard, section 910(h)(1) is ambiguous and we must therefore look to its legislative history and underlying purposes to determine congressional intent.

The Director argues both that section 910(h)(1) clearly indicates that this is not a case for the use of the special fund and that the language of section 910(h)(3) reinforces this conclusion. He first notes that the first sentence of section 910(h)(1) provides for benefit adjustment "due to total permanent disability or death which commenced or occurred prior to October 27, 1972." He interprets this provision as indicating that while disability must commence prior to the amendments' effective date to permit special fund reimbursement, death must actually occur before that time to similarly qualify. While this is one plausible interpretation of the sentence, it is certainly not the only one, for it is also plausible that Congress intended the term "commence" to refer both to disability and to death. In such a case, when a party was injured pre-amendment and died from that injury post-amendment, one could say that the death had commenced prior to the amendment date.

The Director next points to the language of section 910(h)(1)(A). That provision states that adjustments paid to beneficiaries should be determined by subtracting the amount of entitlement under the pre-amendment Act from the current benefits obtainable. The Director claims that since Dennis was not entitled to death benefits under the old statute, this provision cannot apply to him. Thus, he claims that a pre-amendment injury leading to a post-amendment death was not contemplated as within the special fund by section 910(h)(1).

We disagree. Dennis was entitled to disability benefits prior to his death. After the passage of the amendments, those benefits were adjusted pursuant to section 910(h)(1). The new compensation was added to the base amount that was owed to Dennis prior to the amendments. The same is true in this case. While the benefits are now termed death benefits instead of disability benefits, the new amount is still being added to the pre-amendment amount owed by the carrier or employer. The benefits are still calculated by reference to a national average weekly wage. There is little difference in the adjustment process, other than one of nomenclature. Thus, the statutory scheme suggests to us that section 910(h)(1)(A) contemplates just such a situation as that presented in the instant case.

Finally, the Director argues that, as applied here, coverage under section 910(h)(1) has been excluded by the language of section 910(h)(3). That section states that for purposes of the annual adjustment "an injury which resulted in permanent total disability or death which occurred prior to October 27, 1972 shall be considered to have occurred on the day following such date." The Director notes that the relevant inquiry in section 910(h)(3) is the date

of injury, as opposed to the inquiry in section 910(h)(1), which is based on the date disability commences or death occurs. The Director argues that since Congress could have used the later language in section 910(h)(1) and failed to do so, Congress must have intended to provide for adjustments only when death occurred pre-amendment.

It is often true that the inclusion of language in one section of a statute, but not in another section is indicative of congressional intent that the omitted language not be applied to the later section. *See, e.g., Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983); *Lynch v. Johns–Manville Sales Corp.,* 710 F.2d 1194, 1197 (6th Cir.1983). However, that line of cases addresses situations in which earlier specific language was elsewhere specifically omitted. Here, the statute merely uses clearer language in section 910(h)(3) than in section 910(h)(1). Far from indicating an opposite intent, the clearer language merely adds further credence to the claim that the language of section 910(h)(1) is at best ambiguous.

Director's arguments to the contrary, we find that the language of section 910(h)(1) is indeed ambiguous. Because the statute is capable of two reasonable interpretations, we therefore look to the statute's underlying legislative history and intent to determine its appropriate construction. *See, e.g., Dixson v. United States,* 465 U.S. 482, 491, 104 S.Ct. 1172, 1177, 79 L.Ed.2d 458 (1984); *United States v. Graham Mortgage Corp.* 740 F.2d 414, 417 (6th Cir. 1984).

The House and Senate Reports for the 1972 amendments to the LHWCA are not particularly instructive. The House Report, H.R.Rep. No. 1441, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S. Code Cong. & Admin. News 4698, only discusses section 910(h) in two instances. First, the report says that section 910(h) "increase[s] future benefits to be paid to those people who have been receiving compensation for benefits for total disability or death...." *Id.* at 4, 1972 U.S. Code Cong. & Admin. News at 4700. The report goes on in the section by section analysis merely to track

the language of section 910(h) when describing it. *Id.* at 22, 1972 U.S.Code Cong. & Admin.News at 4716.

S.Rep. No. 1125, 92d Cong., 2d Sess. (1972) also includes only two references to section 910(h). In the summary of the legislation section the report uses the identical language quoted above in the House Report. *Id.* at 6. In the section by section analysis the Senate Report further states that "[s]ubsection [910] (h)(1) provides that employees or survivors already receiving payments under the Act as a result of total permanent disability or death, would have their future compensation adjusted within 90 days after enactment of this bill." *Id.* at 22, U.S.Code Cong. & Admin.News 1972, p. 4716.

The Director contends that this language proves that section 910(h) does not apply to the instant situation because it refers to people *who have been receiving benefits* since before the effective date of the enactments. Since death benefits go to the family of the injured employee and not the employee himself, the Director argues that this language excludes post-amendment deaths from the provisions of section 910(h)(1). Such a reading while plausible, is not conclusive. It could easily be argued that "those people who have been receiving benefits" should be read liberally to include the family of a permanently injured workman once that workman dies. Thus, we find the language of the House and Senate Reports inconclusive.

The House and Senate floor debates on the 1972 amendments are also relatively free of discussion regarding section 910(h)(1). However, Representative Steiger entered a series of questions and answers into the record including a statement that "[b]enefits for post enactment injuries can be covered by insurance, but insurance cannot be retroactive." 118 Cong. Rec. 36,385 (1972). This statement was made as part of a justification for the enlargement of the special fund. We recognize the risk of too ready a reliance upon expression of intent by individual legislators, *Chandler v. Roudebush,* 425 U.S. 840, 859 n. 36, 96 S.Ct. 1949, 1959, n. 36, 48 L.Ed.2d 416

(1976), but clearly at least one congressman in contemporaneous remarks intended section 910(h) to relieve the potential burden of retroactive liability from insurance carriers and employers.

More persuasive is our observation that the House and Senate hearings on the amendments demonstrate that Congress was made aware of possible problems in the insurance industry if the new statute retroactively increased benefits. One of the strongest advocates of the rights of the insurance industry was Edward D. Vickery, of the National Maritime Compensation Committee. When testifying before a House subcommittee he noted the express problem with which we are confronted here. Referring to section 910(h) he stated that the amendment "leaves an ambiguity with respect to death. It is submitted that this ambiguity should be cured ... by providing that the amendments relate only to deaths resulting from injuries sustained after the effective date." *Longshoremen's and Harbor Workers' Compensation Act: Hearings on* H.R. 247, 3505, 12006 & 15023 *Before the Select Subcomm. on Labor of the House Comm. on Education and Labor,* 92d Cong., 2d Sess. 131–32 (1972) [House Hearings].

When testifying before a Senate Subcommittee he explained his reasoning:

Making retroactive increases in the weekly compensation rates as this proposed amendment would do presents problems which we believe are insurmountable insofar as the fixing of insurance premium rates or the setting of reserves for self-insurers under the Act are concerned. A brief example might be of help to point out the problems here. If an award is made for a partial loss of wage earning capacity, say of $20 per week this year, it might well run for a period of 15 or 20 years or longer. How is it going to be possible to estimate with any semblance of reason how much that $20 partial loss of wage award is to be increased each year? But of even greater significance, how can an insurance carrier set premium rates to provide for unknown increases in the future or how

can a self-insurer set aside reserves to protect itself against increases which may not occur for 15 or 20 years or more.

It is the retroactive nature of the amendment in its present form which is, we submit, unworkable, and we believe will make it extremely difficult, if not impossible, to obtain insurance coverage under the Act. The uncertainties and the substantial speculation which insurance carriers would have to engage in insofar as their rates are concerned—trying to anticipate increases that would occur over a period of 20 or 30 years or more—simply makes this provision unworkable as long as it is made retroactive. Thus in any amendment to provide for automatic increases in weekly compensation benefits on an annual basis, the National Maritime Compensation Committee believes it is important for the amendment to expressly provide that the increased weekly compensation rate shall apply only to injuries sustained after the effective date of the new rate and only to deaths resulting from injuries sustained after the effective date of the new rate.

*Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972: Hearings on* S. 2318, 525 & 1547 *Before the Subcomm. on Labor of the Senate Comm. on Labor & Public Welfare,* 92d Cong., 2d Sess. 342–43 (1972).

Vickery testified in the Senate on May 24, 1972 and in the House on July 18, 1972. At that time, neither the House nor the Senate bill contained a provision similar to section 910(h). The first time a version of section 910(h) appeared in a bill was on September 19, 1972 in H.R. 16725. The Director asserts that the fact that Congress did not adopt the specific language suggested by Vickery is evidence of the fact that it did not intend to apply the special fund to situations such as the one presented in the instant case. However, Congress did draft section 910(h) after hearing the testimony of Vickery and oth-

ers [6] about the need to protect the insurance industry. That it did not use the exact method specified in the hearings does not indicate that it sought a different result from the one requested.

Neither the statute nor the legislative history of the 1972 amendments clearly indicates the result that Congress intended under the situation here. We therefore must look to the underlying purpose of the statute and the manner in which it has been interpreted in the courts.

There is no question that the main purpose of the 1972 amendments was to increase compensation to long neglected beneficiaries.[7] However, Congress also made it clear that the rights of employers and insurance carriers would not be ignored. By amending 33 U.S.C. § 944 Congress set forth a clear plan of spreading the cost of the increases in disability and death benefits between the various insurance carriers and self-insured companies. Congress intended that the changes in benefits should not unduly harm an insurer or business whose actuarial planning was upset by the amendments. We view this as a classic case of congressional compromise. We are not alone in this view. In *Base Billeting Fund Laughlin Air Force Base v. Hernandez*, 588 F.2d 173 (5th Cir.1979), the court noted the need for the special fund, stating that "insurers would be able to adjust their rates to take account of the higher compensation levels mandated by §§ 906 and 910(f) for injuries occurring after the amendments, but § 910(h) increased compensation for injuries which had already occurred, and insurers could not have provided for these increases when they set their rates." *Id.* at 176.

Given Congress' desire to protect the rights of insurers and employers, the interpretation of the statute presented by the Director appears strained. No party to this action disputes either that pre-amendment injury or death benefits adjusted pursuant to section 910(h) is covered by the special fund or that annual adjustments to disability benefits arising out of pre-amendment injuries are covered by the special fund. The Director even concedes that non-disabling pre-amendment injuries that become disabling post-amendment are entitled to coverage under the special fund. Given the demonstrated concern by Congress for the position of employers or insurers in these other instances where an injury occurred pre-amendment, it is difficult to interpret the section 910(h) to exclude the instant case from special fund coverage, especially in the absence of more explicit statutory language or legislative history.[8]

The Director has cited considerable precedent for the proposition that death benefits are a separate cause of action from disability benefits. He uses these cases to argue that imposing the full cost of Dennis' death benefits on the insurance carrier and employer in this case is not retroactive liability because the liability did not arise until Dennis died.[9]

6. Secretary of Labor James D. Hodgson argued before the House that:

> One problem which should be considered is whether there is a need to establish a special fund to compensate insurers for increased benefit payments. Since future benefit levels are unknown, in a system of annual adjustments insurers would have difficulty setting premium rates. Payment of higher benefits out of lower premiums set before adjustments in benefit levels could undermine the actuarial soundness of the compensation plan.

House Hearings at 49.

7. *See, e.g.,* S.Rep. No. 1125, 92d Cong., 2d Sess. 4 (1972) ("Clearly, in order to provide adequate income replacement for disabled workers covered under this law a substantial increase in benefits is urgently required."); H.R.Rep. No. 1441, 92d Cong., 2d Sess. 2 (1972), *reprinted in* 1972

U.S. Code Cong. & Admin. News 4698–99 ("In order to provide adequate income replacement for disabled workers covered under this law a substantial increase in benefits is needed.").

8. See *Hernandez,* 588 F.2d at 176 n. 1. ("It would be odd for § 910(h)(3) annual adjustments to be paid out of the fund while the higher initial benefit levels are not-as far as an insurer's ability to anticipate the payments in setting its rates is concerned, there seems to be no difference between them—yet that is what a literal reading of (h)(1) and (h)(3) apparently requires. For these reasons we believe the text of the statutes is not dispositive.").

9. *See, e.g., Travelers Insurance Co. v. Marshall,* 634 F.2d 843, 846 (5th Cir.1981) ("a cause of action for death benefits certainly does not arise

We find none of the Director's cases to be directly relevant to the instant action. In none of the cases is the issue whether section 910(h) allows an insurer or employer to be reimbursed for post-amendment increases in death benefits when death arose from a pre-amendment injury. Indeed, none of the Director's cases involves *either* a case where post-amendment death occurred as a result of a pre-amendment injury *or* a case where an employer or insurer is requesting coverage under the special fund.[10]

In rendering the decision below, the Board relied upon two previous Board decisions, *Hernandez v. Base Billeting Fund, Laughlin Air Force Base*, 13 BRBS 214 (1980), *on recon.* 13 BRBS 220 (1981) and *Silberstein v. Service Printing Co.*, 2 BRBS 143 (1975). Both of those cases concerned the applicability of the special fund to cases where injury had occurred pre-amendment but had not become permanently totally disabling until after the amendment. However, both cases also mentioned, albeit in dicta, the instant situation.

In *Silberstein*, the Board noted "that the intent and purpose of all of section [9]10(h) is to upgrade benefits for permanent total disability or death from injuries occurring prior to the effective date of the amendments to the Act." 2 BRBS at 151. Again, in *Hernandez*, the Board remarked "[s]ec-

tion [9]10(h)(1) provides for an initial adjustment to upgrade benefits for permanent total disability or death resulting from pre-amendment injuries." 13 BRBS at 216.

We noted at the outset that we do not owe the Board any automatic deference in matters pertaining to the Longshoremen's Act. However, we also took notice of cases that held that a decision of the Board should be given more respect when it is in line with the basic policies underlying the statute in question.[11] Of even greater importance, our own review of the statute, its history and its underlying purpose convinces us that it was an important congressional objective to preserve the integrity of the actuarial calculations of insurance carriers and self-insured employers.

The decision below of the Benefits Review Board is

AFFIRMED.

DAVID A. NELSON, Circuit Judge, dissenting.

The court has discerned in the statutory scheme complexities and ambiguities that are not apparent to me. The pertinent provisions of the statute may not be wise, but I think they are clear—and the application of the clear language of the statute to the undisputed facts of this case compels the conclusion, I believe, that the burden of

---

until death...."); *Puig v. Standard Dredging Corp.*, 599 F.2d 467, 469 (1st Cir.1979) ("We first note that cases under the Longshoremen's Act have consistently held that the right to death benefits is separate and distinct from the right to disability benefits and does not arise until death occurs."); *Todd Shipyards Corp. v. Witthuhn*, 596 F.2d 899, 902 (9th Cir.1979) ("The deaths of Harold Witthuhn and Clarence Foley gave rise to new claims for relief not in existence during their lifetimes.").

10. *Marshall* involves a claimant who died of causes unrelated to his pre-amendment injury. It is a suit by an insurer who insured the beneficiary at the time of his accident, claiming that it is impermissible for the Board to impose liability on it for an unrelated death of a worker occurring after the end of its term of insurance coverage. 634 F.2d at 844. *Puig*, another unrelated death case, challenges the constitutionality of 33 U.S.C. § 909 which, after its amendment in 1972, extended the liability of insurers to deaths unrelated to injuries or conditions

arising from the workplace. 599 F.2d at 468. In *Witthuhn*, also an unrelated death case, the insurer attempted to escape liability under section 909, claiming it did not apply when the disabling injury occurred pre-amendment. 596 F.2d at 901–02.

The Director also cites to some older cases that hold insurers liable for increases in benefits mandated by different congressional adjustment of benefits, when an injury had occurred prior to those increases, but death had occurred after them. *See, e.g.; Travelers Insurance Co. v. Toner*, 190 F.2d 30, 31 (D.C.Cir.1951); *Penn Jersey Welding Co. v. Lowe*, 183 F.2d 936, 937 (3d Cir.1950). These cases do not concern the application of the special fund, as no provision similar to section 910(h) was in effect at the time of their decision. Thus, they are not relevant here.

11. *See, e.g., Kaiser Steel Corp. v. Director, Office of Workers' Comp. Prog.*, 812 F.2d 518, 521 (9th Cir.1987); *Long v. Director, Office of Workers' Comp. Prog.*, 767 F.2d 1578 (9th Cir.1985).

paying the portion of the death benefits that Charles Dennis' widow is receiving under § 9 of the Longshore and Harbor Workers' Compensation Act (33 U.S.C. § 909) must be born entirely by the insurance companies that provided bonding coverage for Mr. Dennis' employer. (The employer, we are informed, was a self-insurer that is now defunct.)

If there is any ambiguity in the statutory scheme, it stems from the first sentence of § 10(h)(1) of the Act. That sentence, as codified in 33 U.S.C. § 910(h)(1), reads as follows:

> "Not later than ninety days after October 27, 1972, the compensation to which an employee or his survivor is entitled due to total permanent disability or death which commenced or occurred prior to October 27, 1972, shall be adjusted."

There has been no suggestion that there is anything ambiguous about the application of this sentence to the disability benefits that Mr. Dennis himself received as a totally and permanently disabled employee. Mr. Dennis' disability having commenced prior to October 27, 1972, the quoted sentence made it mandatory that "[n]ot later than ninety days after [that date], the compensation to which [the] employee ... [was] entitled ... be adjusted." Mr. Dennis' disability compensation was in fact adjusted, in accordance with the statutory formula. The additional compensation received by Mr. Dennis as a result of the adjustment was ultimately paid out of "special fund" monies and congressional appropriations, as required by § 10(h)(2) of the Act. ("Fifty per centum of any additional compensation ... paid as a result of the adjustment required by [§ 10(h)(1) ] ... shall be paid out of the special fund ..., and 50 per centum shall be paid from appropriations.")

When Mr. Dennis died in September of 1980, his disability compensation stopped. In its place, the Deputy Commissioner of the Tenth Compensation District made an award of compensation to Mr. Dennis' widow at an initial rate of $106.57 per week, beginning as of September 2, 1980. The compensation thus awarded to Mrs. Dennis, as the employee's surviving spouse, was termed a "death benefit" under § 9 of the Act. ("[T]he compensation [for an employee's death] ... shall be known as a death benefit....") The initial amount of the death benefit was calculated not under § 10, but under § 9.

If Mr. Dennis had died before the 1972 amendments to § 9 of the Act became effective, the death benefits payable to his widow would have been substantially less than the $106.57 per week actually awarded. As I read the majority opinion in this case, the court is under the impression that arguably, at least, the award of death benefits greater than those that would have been payable under the pre–1972 version of § 9 constituted an "adjustment" under § 10 of the Act. And if the death benefits were "adjusted" under § 10, there can be no question that the additional amount payable by reason of the adjustment would have to come out of the special fund and congressional appropriations, and not out of the coffers of the insurance companies.

The problem, as I see it, is that there is no basis whatever for supposing that the difference between the death benefits that would have been payable under the pre–1972 version of § 9 and the death benefits payable under the post–1972 version of § 9 constituted an "adjustment" required by § 10.

Any adjustment made under § 10(h)(1) of the Act must, according to the opening words of the opening sentence of that section, be made "[n]ot later than ninety days after October 27, 1972...." The award of death benefits to Mr. Dennis' widow in the case at bar was made on November 4, 1980, and the death benefits were only awarded as from September 2, 1980. I do not understand how this award can be deemed to have been made "[n]ot later than ninety days after October 27, 1972"; and if the award was not made within the time frame required by § 10 of the Act, I do not understand how the award can be thought to qualify as an "adjustment" under § 10.

Nothing in the wording of the award itself lends any support to the conclusion that the death benefits being awarded to

Mrs. Dennis were somehow being "adjusted" under § 10(h)(1). Insofar as the portion of the award that is at issue here is concerned, the award refers only to § 9:

"Mrs. Ethel Scott Dennis, widow of the deceased employee[,] is entitled to death benefits *pursuant to Section 9* ... the employer and carrier shall also pay $1,000.00 funeral expenses *in accordance with Section 9(a) of the Act.*" (Emphasis supplied.)

Under the terms of the award, none of these death benefits and funeral expenses can be attributed to an "adjustment" required by § 10(h)(1) of the Act.

If the Deputy Commissioner was not purporting to make a § 10(h)(1) adjustment when he awarded death benefits to the widow on November 4, 1980, it remains only to be considered whether any part of the widow's weekly benefit of $106.57 could somehow have represented an "adjustment" under § 10(h)(1) notwithstanding the fact that it was not so designated. The answer, in my opinion, is no.

In the first place, there were not any death benefits to be adjusted before Mr. Dennis actually died. The award made by the Deputy Commissioner on November 4, 1980, was the initial award of death benefits; its amount could only have been calculated, in the first instance, under § 9.

In the second place, even if Mrs. Dennis had somehow been entitled to receive death benefits in anticipation of her husband's eventual demise, the supposed "adjustment" of such benefits was not made until November 4, 1980. As mentioned above, there is no way an adjustment of death benefits made on November 4, 1980, can fairly be said to have been made "[n]ot later than ninety days after October 27, 1972...." And even if there could somehow have been a § 10(h)(1) death benefit adjustment that came eight years late, the decision rendered by the Benefits Review Board in this case reveals that the amount the widow would have received under the adjustment formula of § 10 was less than the amount to which she was entitled under § 9 of the Act. What she actually received, of course, was a § 9 award, not an adjustment under § 10.

In the third place, no adjustment of death benefits was authorized, under the plain language of § 10(h)(1), unless the employee's death itself had "occurred prior to October 27, 1972...." Mr. Dennis' death did not occur prior to that date—it occurred more than eight years afterward.

In the context of the Act as a whole, it seems to me, the first sentence of § 10(h)(1) must be read as mandating two things: it mandates an adjustment in the employee's disability benefits, if any, where the employee's disability commenced prior to October 27, 1972, and it mandates an adjustment in his survivor's death benefits, if any, where the employee's death occurred prior to October 27, 1972. The interests of brevity were served by commingling the descriptions of the events ("disability or death which commenced or occurred prior to October 27, 1972") that would trigger an adjustment, and I should be very surprised indeed if it ever crossed the draftsman's mind that anyone might think the quoted words could cover a lingering death that "commenced" prior to October 27, 1972, and finally came to a merciful end more than eight years later.

I suppose it is true that, as some mordant soul once observed, "we are all slowly dying." In common understanding, however, the fact that someone was born before a particular date can hardly be said to mean that his death "commenced" prior to that date. Legislative purpose, after all, "is expressed by the ordinary meaning of the words used." *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). To me, as I have said, the first sentence of § 10(h)(1) speaks only of disabilities that commenced before the October 27 date and of deaths that occurred before that date. The majority having read this sentence otherwise, I respectfully dissent. I would reverse the decision of the Benefits Review Board and reinstate the decision of the Administrative Law Judge, thus denying the insurance carriers' claim for further reimbursement.