**BATH IRON WORKS CORPORATION and Commercial Union Insurance Companies, Petitioners,**

v.

**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Respondent.**

No. 91–1079.

United States Court of Appeals, First Circuit.

Heard June 5, 1991.

Decided Aug. 27, 1991.

Allan M. Muir with whom Kevin M. Gillis and Richardson & Troubh, Portland, Me., were on brief, for petitioners.

Michael S. Hertzig, Atty., U.S. Dept. of Labor, Office of the Sol., with whom Robert P. Davis, Sol. of Labor, Carol A. De Deo, Associate Sol., and Janet R. Dunlop, Counsel for Longshore, Washington, D.C., were on brief, for respondent.

Ronald W. Lupton with whom Stinson, Lupton & Weiss, P.A., Bath, Me., was on brief for claimant.

Marcia J. Cleveland and McTeague, Higbee, Libner, MacAdam, Case & Watson, Topsham, Me., on brief, for Russell Harford, amicus curiae.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, and CAFFREY,* Senior District Judge.

BREYER, Chief Judge.

This appeal concerns the calculation of Longshore and Harbor Workers' Compensation Act disability benefits due a retired riveter partially disabled due to deafness. The Act provides three different systems for compensating partially disabled workers. The first applies to those suffering scheduled (*i.e.,* particular, specifically listed) injuries. The second applies to those suffering other (unscheduled) injuries. The third applies to workers who retire before becoming disabled. The Labor Department's Benefits Review Board awarded benefits to Mr. Brown, the riveter, calculated through use of both the first and third systems. The petitioner, Brown's employer, Bath Iron Works, argues that the Board should have used the third system alone (which would have produced a smaller award). The respondent, the Director of the Labor Department's Office of Workers' Compensation, defends the Board's result, while arguing that the Board should have used the first system alone. We agree with the Director.

## I.

### Background

#### A.

##### The Three Systems

To help the reader understand the three different compensation calculation systems, we shall first describe them in a simplified way without using statutory language.

*System One: Scheduled Injuries.* The Act's schedule (in §§ 8(c)(1)–(20), 33 U.S.C. §§ 908(c)(1)–(20)) lists a number of specific injuries, such as loss of an arm or a leg or total or partial deafness, followed by a specific number of weeks (for example, loss of an arm, 312 weeks). The Act entitles a worker suffering one of the listed injuries to two-thirds of his average weekly wages for the listed number of weeks. Thus, for example, a worker earning $600 per week (just over $30,000 per year), who loses an arm, would receive about $400 per week (two-thirds of his average weekly wages) for 312 weeks, totalling about $125,000, spread out over six years. *See* 33 U.S.C. § 908(c)(1). If that worker had become completely deaf, he would receive the $400

* Of the District of Massachusetts, sitting by designation.

per week (two-thirds of his average weekly wages) for 200 weeks, or about $80,000, spread over about four years. *See* 33 U.S.C. § 908(c)(13)(B). The schedule provides for proportionate modification of the award for partial losses.

*System Two: "Unscheduled" Injuries.* The Act sets forth a different method for compensating other injuries not specifically listed in section 8(c)'s schedule. In such cases, § 8(c)(21), 33 U.S.C. § 908(c)(21), says that a worker will receive two-thirds of the *difference* between his average weekly wages and his residual (post-injury) earning capacity (as determined by the Labor Department) for as long as the disability continues. Thus, the same $600 per week worker, who suffers, say, a slipped disk (not listed on the schedule) and who retains the capacity to earn only $150 per week, would receive benefits of $300 per week (two-thirds of the $450 *difference*) for as long as the disability continues.

*System Three: Injuries Suffered by Retired Workers.* In 1984, Congress amended the Act to provide a special system of compensation for workers whose job-related injuries (or diseases such as asbestosis) did not become apparent until after retirement. *See* 33 U.S.C. §§ 902(10), 908(c)(23), 910(d)(2), 910(i). In such cases the Act begins with the principle that a disabled worker should receive two-thirds of his average weekly wages for as long as he is disabled, but it then modifies that principle in two important ways.

First, it multiplies the average weekly wage by a percentage, namely the percentage of total disability that the worker has suffered. It takes this percentage from American Medical Association tables. *See* 33 U.S.C. § 908(c)(23). Those tables say, for example, that a totally deaf person is 35% totally disabled. *See American Medical Association Guides to the Evaluation of Permanent Impairment* 170 (3d ed. 1988). If the deaf worker's average weekly wage is $600, the worker would receive, not two-thirds of his weekly wage ($400), but $400 *multiplied* by the percentage of total disability (35%), or $140 per week for the duration of his disability. Because System Three multiplies the average weekly wage by this percentage-of-total-disability, it is often less generous than System One. Sometimes it could turn out to be more generous, however, for it makes its smaller payments, not just for a limited number of weeks, but indefinitely as long as the worker is disabled.

Second, System Three calculates "average weekly wages" in a special way. If the disability appears during the first year after retirement, that term simply means the wages the worker earned just before retirement. *See* 33 U.S.C. § 910(d)(2)(A). If the disability appears after the first year, however, that term means a national average weekly wages figure that the Department of Labor calculates. *See* 33 U.S.C. § 910(d)(2)(B). Depending upon what the worker actually made before retiring, this System Three definition results in awards that are sometimes less generous, but sometimes more generous, than awards under System One.

## B.

### The Statute's Structure

The key statutory language setting forth these three systems includes the following:

1. A *definitional* section defines "disability" (in relevant part) as

incapacity because of injury to earn the wages which the employee was receiving at the time of injury....

33 U.S.C. § 902(10). It adds a special definition of "disability" as

permanent impairment, determined ... under ... American Medical Association [guidelines], in the case of an individual whose claim is described in section 910(d)(2) [i.e., System Three].

*Id.* The definitions also make clear that "injury" includes both job-related accidental injuries and occupational diseases. *See* 33 U.S.C. § 902(2).

2. *Key introductory, operative language, applicable to all three systems,* says,

In case of disability partial in character but permanent in quality the compensation shall be 66⅔ per centum of the aver-

age weekly wages ... and shall be paid to the employee, as follows:

33 U.S.C. § 908(c).

3. Immediately after this introductory language, the statute contains *twenty-three numbered subparagraphs.*

a. *Subparagraphs (1)–(20) and (22)* contain the schedule, which we have called "System One." Subparagraph (13), for example, sets forth the number of weeks compensation for hearing loss. *See* 33 U.S.C. §§ 908(c)(1)–(20), (22).

b. *Subparagraph (21)* contains what we have called "System Two." It says,

Other cases: In all other cases in the class of disability, the compensation shall be 66⅔ per centum of the difference between the average weekly wages of the employee and the employee's wage earning capacity thereafter ... payable during the continuance of partial disability.

33 U.S.C. § 908(c)(21).

c. *Subparagraph (23)* contains the basic instruction for System Three. It says,

Notwithstanding paragraphs (1) through (22), with respect to a claim for permanent partial disability for which the average weekly wages are determined under section 910(d)(2) of this title, the compensation shall be 66⅔ per centum of such average weekly wages multiplied by the percentage of permanent impairment, as determined under the [AMA guidelines], payable during the continuance of such impairment.

33 U.S.C. § 908(c)(23).

4. As the last quoted sentence makes clear, *subparagraph (23)* (*i.e.*, System Three) applies only "to a claim ... for which the average weekly wages are determined under section 910(d)(2)." That subsection, 33 U.S.C. § 910(d)(2), and the definitional section referred to in that section, 33 U.S.C. § 910(i), set forth the System Three method for calculating "average weekly wages" that we have described above. *See* p. 813, *supra.* More importantly for present purposes, that section says that its calculation method shall be used

with respect to any claim based on a ... disability due to an occupational disease for which the time of injury (as determined under subsection (i) of this section) occurs

(A) within the first year after the employee has retired, ... or

(B) more than one year after the employee has retired....

33 U.S.C. § 910(d)(2). Subsection (i), which this subsection cross-references, defines "time of injury" for System Three purposes. It says,

For purposes of this section with respect to a claim for compensation for ... disability due to an occupational disease which does not immediately result in death or disability, the time of injury shall be deemed to be the date on which the employee ... becomes aware [or should have become aware] ... of the relationship between the employment, the disease, and the ... disability.

33 U.S.C. § 910(i).

All this quoted language seems complex. But, as we read it, it basically says something that is fairly simple: When the "time of injury" occurs before retirement, the Labor Department should calculate compensation under either System One (if the injury is scheduled) or System Two (if the injury is not scheduled). When the "time of injury" occurs after retirement, the Labor Department should calculate compensation under System Three.

## C.

### The Need for System Three

Congress enacted the 1984 amendments creating System Three in response to a Benefits Review Board decision called *Aduddell v. Owens–Corning Fiberglass,* 16 Ben.Rev.Bd.Serv. 131 (1984). In *Aduddell,* the Board considered a worker with asbestosis, who retired "prior to the manifestation of [the] ... occupational disease." *Id.* at 133. The Board, pointing out that the "disease became manifest" long "after the claimant had retired," reasoned that its occurrence did not bring about a "loss of wage-earning capacity." *Id.*

Hence, the "injury" (*i.e.*, the disease) was not a "disability" as the Act defines that term. *Id.* Subsequently, the Board decided *Redick v. Bethlehem Steel Corp.*, 16 Ben.Rev.Bd.Serv. 155 (1984), a case involving a worker's deafness that did not become "manifest" until after the worker had retired. It held, for similar reasons, that the Act did not authorize compensation. *See id.* at 157.

Congress enacted System Three in order to provide compensation that *Aduddell* denied. Congressional reports focused primarily upon "long-latency diseases" and Board cases that had considered asbestos-related diseases. *See* H.R.Conf.Rep. No. 1027, 98th Cong., 2d Sess. 30 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 2771, 2780 (stating that the conferees specifically rejected the holdings of *Aduddell* and *Dunn v. Todd Shipyards*, 13 Ben.Rev.Bd.Serv. 647 (1981), both of which involved asbestos-related diseases); H.R.Rep. No. 570, 98th Cong., 1st Sess. 10–12 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 2734, 2743–45 (describing the amendments as concerning "long-latency occupational diseases," and specifically rejecting *Dunn*, which concerned an asbestos-related disease); *cf.* 130 Cong.Rec. H 9730 (daily ed. Sept. 18, 1984) (remarks of Rep. Miller) (stating that the amendments are intended to overrule *Dunn, Aduddell,* and *Worrell v. Newport News Shipbuilding and Dry Dock Co.*, 16 Ben.Rev.Bd.Serv. 216 (1983), all of which involved asbestos-related diseases). Senator Hatch, a sponsor of the amendments, said that decisions such as *Aduddell* and *Redick* "did not represent equitable policy." 130 Cong.Rec. 26,300 (1984) (remarks of Sen. Hatch). He noted that the amendments made "express provisions for the payment of benefits to retirees who become disabled during retirement as a result of an occupational disease." *Id.* In essence, Congress seems to have read the Board's decisions as denying compensation to workers whose job-related injuries occurred after retirement, and it rewrote the statute to make certain those workers received compensation.

## II.

### *The Legal Issue*

The worker in this case, Ernest C. Brown, worked for Bath Iron Works almost continuously from 1939 until 1972, when he retired. In 1985 he received the results of a hearing test that showed he had lost 82.4% of his hearing while he was at work. He then asked for compensation (taking advantage of a special statutory provision that, in effect, tolls the time deadline for filing a claim based on deafness until after the worker receives an audiogram). The Board, in awarding him compensation, said that, since he was a retired worker, he fell within the scope of System Three. But, it added that it would calculate compensation according to System One. The Board noted that, for a deaf person, System One's compensation (two-thirds of average weekly wages for, say, 200 weeks) would likely prove far more generous than System Three compensation (two-thirds-average-weekly-wages times percent-of-total-disability (*e.g.*, 35%) as long as the disability persists). It pointed out that a deaf worker who filed before retirement would automatically receive the former compensation. And, it could find no reason why Congress would want a deaf worker who did not file until after retirement to receive so much less. It referred to a Supreme Court case, *Potomac Electric Power Co. v. Director, OWCP*, 449 U.S. 268, 101 S.Ct. 509, 66 L.Ed.2d 446 (1980), which it took as holding that System One's schedule provides the proper compensation for anyone suffering a scheduled injury.

Bath Iron Works, Brown's employer, appeals the Board's decision, arguing that it makes no sense. Look at the words of the statute creating System Three, says Bath. Those words do not create any kind of "hybrid" system. Rather, they say specifically that, where System Three applies, the Board should calculate benefits as System Three commands, "*notwithstanding paragraphs (1) through (22),*" i.e., "*notwithstanding*" the statute's instructions for calculating System One and System Two benefits. *See* 33 U.S.C. § 908(c)(23). The

Supreme Court case, *Potomac Electric,* adds Bath, has nothing to do with the matter. Rather, that case concerned a worker with a scheduled System One injury (permanent partial loss of the use of his leg) who wanted to obtain (in his case, larger) unscheduled System Two benefits. The Supreme Court held that he could not do so, primarily because the introductory language applicable to both systems (indeed, to all three systems) says that the compensation *"shall be"* what the subsequent paragraphs provide. *See Potomac Electric,* 449 U.S. at 274, 101 S.Ct. at 512. In other words, where those subsequent paragraphs provide a schedule, *see* 33 U.S.C. §§ 908(c)(1)–(20) & (22), the compensation shall be the scheduled amount; where the injury is unscheduled, *see* 33 U.S.C. § 908(c)(21), it shall be the unscheduled (subparagraph 21) amount. Bath might have added that, in fact, *Potomac Electric* supports Bath, not the Board, for the language "shall be" also applies to System Three's subparagraph (23). Thus, where subparagraph (23) applies, compensation shall be in the amount that it provides *"notwithstanding paragraphs (1) through (22)."* 33 U.S.C. § 908(c)(23).

The Fifth Circuit has accepted the very argument that Bath makes here. And, in a case identical to this one, it has ordered the Board to recalculate benefits under System Three, not System One rules. *See Ingalls Shipbuilding, Inc. v. Director, OWCP,* 898 F.2d 1088, 1091 (5th Cir.1990). The Director of the Labor Department's Office of Workers' Compensation Programs urges us, however, to reach a different result. The Director argues that the Board has reached the correct result, but used the wrong reasoning to get there. We find the Director's argument convincing. We therefore must reach a conclusion different from that of the Fifth Circuit.

The Director's argument is a simple one. He agrees that System Three would apply in its entirety to a worker who suffers an injury after retirement. And, he agrees that asbestosis is normally that kind of injury. But, deafness, he says, is not. Rather, deafness is an injury that a worker typically suffers *before* retirement. After retirement a worker's workplace-noise-induced deafness will not ordinarily grow worse; if anything it will get better. *See* R.T. Sataloff & J. Sataloff, *Occupational Hearing Loss* 357 (1987). Moreover, unlike asbestosis, the symptoms of deafness occur simultaneously with the "disease." In other words, to say that a worker is "84.4% deaf" is to say that he has lost 84.4% of his hearing. If he does not notice his deafness, and does not file a claim until long after retirement, that fact does not mean he is not deaf; it does not mean he has no deafness symptom; rather, it means he may have grown accustomed to his deafness, which is quite a different matter.

We accept the Director's description of deafness as accurate for two reasons. First, the Director supports that description with citations to appropriate scientific treatises. Second, no one in this case disputes its accuracy. Indeed, the Board itself concedes that Brown became 84% deaf in 1972, at the workplace. It does not say that Brown had a disease that *only later,* after retirement, caused him to lose his hearing.

Once we accept the Director's (and the Board's) description of the characteristics of deafness, the law seems to us to mandate compensation according to System One. The language applicable to System Three makes clear that that System does not apply at all. As we have pointed out above, System Three's subparagraph (23) says that it applies only in cases where average weekly wages are compensated under "section 910(d)(2)." 33 U.S.C. § 908(c)(23). Similarly, the special part of the statute's "disability" definition that refers to the AMA guidelines applies only to "an individual whose claim is described in section 910(d)(2)." 33 U.S.C. § 902(10). Section 910(d)(2) says that it applies only where the "disability ... occurs ... within the first year *after the employee has retired* ... or ... more than one year *after the employee has retired....*" 33 U.S.C. § 910(d)(2). Using ordinary English, however, one would normally say that a worker who becomes deaf before retirement is a worker whose disability "occurs" *before* re-

tirement, not after retirement. Hence, the language of section 910(d)(2) seems not to apply to a worker who becomes deaf at the workplace.

The same section, section 910(d)(2), reinforces the same point by making clear that it applies only where there is a *"time of injury (as determined under subsection (i))."* 33 U.S.C. § 910(d)(2). Subsection (i) calculates a special post-retirement time of injury "with respect to a claim for compensation for ... disability due to an occupational disease which does not immediately result in ... disability." 33 U.S.C. § 910(i). Again, using ordinary English, one would normally say that deafness is a disease that causes its symptoms, namely loss of hearing, simultaneously with its occurrence. One simply cannot say that a person suffering from deafness is not deaf—whether or not he notices how deaf he is.

Just as the statute's language suggests that the worker who becomes deaf just before retirement falls outside the scope of System Three, it suggests that he falls within the scope of System One. The statute says that if he suffers a "disability," 33 U.S.C. § 908(c), called "loss of hearing," 33 U.S.C. § 908(c)(13), he "shall be paid," 33 U.S.C. § 908(c), System One's scheduled (§ 908(c)(13)) amount. He suffers a "disability" if he had an "incapacity because of injury to earn the wages" which he was "receiving at the *time of injury.*" 33 U.S.C. § 902(10). Again, given the Director's undisputed account of how deafness occurs, one would ordinarily say that the "time of injury" in the case of a worker who goes deaf on the job is the time he loses his hearing, even if he does not notice that loss until later. Hence, such a worker would be entitled to System One compensation.

We recognize four arguments, however, that tend to support Bath, or the Board. First, in *Redick v. Bethlehem Steel Corp.,* 16 Ben.Rev.Bd.Serv. 155 (1984), the Board came to a different conclusion. There it held that a deaf worker who voluntarily retires "prior to the manifestation of his disability" is *not* entitled to System One compensation. *See id.* at 157. It adopted the same reasoning it had used in *Aduddell* in respect to asbestosis, namely that the injury to such a worker does not create (in the words of the statute's "disability" definition) an "incapacity because of injury to earn the wages which the employee was receiving at the time of injury." *See id.* Since he was retired anyway, the Board said, the deafness did not cause a loss of wage-earning capacity. Extending this reasoning, a deaf worker such as Brown who did not become aware of his disability nor file his disability benefit claim until after he voluntarily retired, would not fall within Systems One or Two (for his injury would not satisfy the normal "disability" definition), and if he did not fall within System Three, he would not fall within any system at all.

We do not believe, however, that *Redick* leads to such a result. If we assume that the *Redick* Board used the word "manifestation" to refer to the appearance of disabling symptoms, then the present case is distinguishable. If *Redick* used "manifestation" in such a way, then it must either have (1) made what it would now apparently concede were incorrect assumptions about the nature of normal hearing loss (namely, it must have assumed that workplace incidents often cause no immediate hearing loss, but lead to delayed hearing loss), or (2) believed that it was dealing with a special case in which a pre-retirement disease did not cause hearing loss prior to retirement, but caused such loss after retirement. Under either of these factual assumptions, the claim in *Redick* would now (after the 1984 amendments) be treated under System Three, because the disability in question would fall within the scope of § 910(i)'s category of a "disability due to an occupational disease which does not immediately result in ... disability," and therefore the "time of injury" (under § 910(i), the time of awareness "of the relationship between the employment, the disease, and the death or disability") would be after the employee had retired. By contrast, in this case, we assume that Brown's disabling symptoms appeared simultaneously with his disease—deafness—over the course of his employment.

Thus, Brown's injury "manifested" itself prior to retirement; and therefore the *Redick* holding does not fit this case, nor does this case fall within System Three.

If we assume that *Redick* used "manifestation" to refer, not to the appearance of disabling symptoms, but to the point at which the claimant notices those symptoms—in other words, if the *Redick* Board believed that the hearing loss occurred before retirement, but the claimant did not notice the hearing loss until after retirement—then we believe that the holding in *Redick* was simply wrong. A person who loses his ability to hear even just before he retires, like a person who loses an arm just before he retires, is a person about whom one often can reasonably say, "he has an 'incapacity because of injury to earn the wages' that he was 'receiving at the time of injury.'" 33 U.S.C. § 902(10). For one thing, the word "incapacity" does not mean a failure, in fact, to earn prior wages; it means an *inability* to earn prior wages. A physically fit retired worker is likely to be *able* to earn prior wages (though he likely chooses not to do so); a retired worker without an arm or without hearing is, comparatively speaking, often less likely to be *able* to earn prior wages even should he choose to try to do so. For another thing, and more importantly, the statute *presumes* that a worker who suffers a scheduled injury suffers an "incapacity because of injury to earn" prior wages. Such has long been the law. The Second Circuit, more than thirty-five years ago, wrote that

> in the case of schedule losses, the Congress has determined that a loss of wage-earning capacity and its extent are conclusively established when one of the enumerated physical impairments is proven to have arisen out of the employment.

*Travelers Insurance Co. v. Cardillo*, 225 F.2d 137, 144 (2d Cir.1955). And, the Supreme Court, more recently describing System One, said,

> the injured employee is entitled to receive two-thirds of his average weekly wages for a specific number of weeks, regardless of whether his earning capacity has actually been impaired.

*Potomac Electric*, 449 U.S. at 269, 101 S.Ct. at 510. This law is understandable, for without it (and under the Board's *Redick* reasoning), a worker, who, say, suffered a bad accident the day before his retirement, and who awoke from a coma a week later (after retirement) to find he had lost an arm, would receive no scheduled compensation.

Second, the Board points out that Senator Hatch, a sponsor of the 1984 "System Three" amendments, listed *Redick* as one of several cases that he believed "did not represent equitable policy." 130 Cong.Rec. 26,300 (1984) (remarks of Sen. Hatch). It concludes from this that the System Three amendments, designed to overcome the inequitable results, must have included hearing loss cases. This argument, however, seeks to prove far too much on the basis of far too little. For one thing, the Senator may well have read *Redick* as involving hearing loss that did not *occur* until after retirement, in which event, it would resemble asbestosis and fall within System Three. For another thing, the Senator need not have cared about the precise rationale of *Redick*, for, insofar as it dealt with typical hearing loss occurring prior to retirement, it could be corrected judicially and did not necessarily require special legislation. Finally, the legislative debates primarily concerned "long-latency diseases," such as asbestosis, not hearing loss, and there is no good reason for thinking that Senator Hatch, in his effort to correct unfairness, did want, or would have wanted, the law to treat "hearing loss" cases less generously than it would have done without the amendments.

Third, the Fifth Circuit, in *Ingalls Shipbuilding, Inc. v. Director, OWCP*, 898 F.2d 1088 (5th Cir.1990), has held that the Board correctly placed hearing loss cases within System Three (though it then incorrectly hybridized System Three by bringing in System One's schedule to calculate the payment). In particular, the Fifth Circuit so held while agreeing that "differences may exist between the progression of asbestosis versus hearing loss." *Id.* at 1093. It agreed that asbestosis (as described in

*Aduddell*) is a disease with symptoms that often do not appear until after retirement, while in hearing loss cases "the full extent of the ... injur[y] is set on the day" the worker "leaves the workplace." *Id.* But, it added that the "fact that hearing loss does not progress after retirement does not compel a different compensation scheme absent a showing that Congress intended one." *Id.* at 1093–94. And, it could find no reason for thinking that Congress did intend a different scheme.

We have found such a reason, however, for thinking that Congress did intend a different scheme, in the plain language of the statute. The statute, while complex with operative language placed in different sections, is not ambiguous or unclear once its different parts are unscrambled. For the reasons we have already stated, we conclude that its language treats a hearing loss case differently than an asbestosis case for the very reason that the Fifth Circuit found irrelevant. Because the hearing loss symptoms are irrevocably fixed before retirement, while the asbestosis symptoms may not appear until after retirement, the "time of injury" in the first case, but not the second case, is prior to retirement. Therefore, System Three's operative language (in 33 U.S.C. §§ 910(d)(2) & 910(i)) does not apply, while the ordinary System One and System Two definitions and operative language do apply.

Fourth, the Board, and the Fifth Circuit, refer to cases that define "time of injury" as the time when a disease "manifests" itself rather than the time when the worker suffers his last, disease-causing, exposure. *See Castorina v. Lykes Brothers Steamship Co., Inc.,* 758 F.2d 1025, 1031 (5th Cir.), *cert. denied,* 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985); *Todd Shipyards Corp. v. Black,* 717 F.2d 1280, 1289–91 (1983), *cert. denied,* 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984). These cases, however, are beside the point here, for they concern asbestosis, a disease in which the disabling *symptoms* occur after

retirement. Insofar as the courts and Board used the word "manifestation" to refer to the appearance of disabling symptoms, these decisions make sense, but they seem inapplicable here, where hearing loss is fixed forever before retirement.

In sum, the Director's interpretation is consistent with the ordinary meaning of the statute's language and with its structure; and, it permits the System One compensation calculations that the Board believed necessary to avoid unfairness. The arguments for a different reading are not very convincing. We therefore accept the interpretation of the statute for which the Director argues.

We must mention one final point. The Director points out that, although the Board said it was awarding System One compensation in this case, in fact it did not properly perform the System One calculation. System One requires the calculator to use the "average weekly wages" as of the time of disablement (in this case, 1972). *See* 33 U.S.C. § 910. Instead, the Board used a System Three figure, namely the national average weekly wages as of the time of filing the claim (a 1985 figure). The Director, however, has not asked the Board, nor this Court, to recalculate the award, but, rather, has asked us to affirm it. Bath, while disagreeing with the Board's use of System One's calculation method, nowhere complains of the calculation having been made improperly. The claimant obviously does not want a recalculation (which would produce a lower award). And, the matter has no significance beyond this case. We therefore consider the issue waived.

The Board's award is

*Affirmed.*